CERNUTO, INCORPORATED, a corporation t/d/b/a C & C Builders Supply Company, Appellant,

v.

UNITED CABINET CORPORATION, a corporation, Famous Furnace & Supply Company, a corporation and Robert L. Lappin Company, Inc., a corporation, Appellees.

No. 78–1872.

United States Court of Appeals, Third Circuit.

Argued Jan. 16, 1979.

Decided March 16, 1979.

Howard A. Specter, Michael D. Buchwach (argued), Litman, Litman, Harris & Specter, P.A., Pittsburgh, Pa., for appellant.

Donald E. Seymour, Michael R. Plummer (argued), Kirkpatrick, Lockhart, Johnson & Hutchinson, Pittsburgh, Pa., for appellees.

Before ADAMS and WEIS, Circuit Judges, and WEINER, District Judge.*

OPINION OF THE COURT

ADAMS, Circuit Judge.

We are confronted in this appeal with the termination, by a manufacturer of kitchen cabinets, of one of its customers, a discount house, at the urging of another customer, a retailer, allegedly because of price considerations. Although the manufacturer's action was destructive to competition between the two customers, under the circumstances present here the plaintiff may recover only if the challenged conduct is termed a *per se* violation of the Sherman Act, because under a "rule of reason" analysis the necessary anti-competitive effects as to a particular commodity in a relevant market cannot be proven.[1] Inasmuch as we believe, based on the allegations set forth by the plaintiff, that a *per se* violation of the Act might be found, we reverse the summary judgment entered in favor of the defendants, and remand the case for trial.

## I.

Plaintiff, Cernuto, Inc. (Cernuto), is a seller in Western Pennsylvania of supplies and appliances used in the construction or remodeling of buildings. One of these products is kitchen cabinets. Beginning in March, 1974, United Cabinet Corporation (United), through its sales representative, Robert L. Lappin Company (Lappin), agreed to supply Cernuto with United cabinets for at least a two year period. In return Cernuto agreed to promote, display and sell United's cabinets, and undertook to advertise them and alter its display area so as to feature them prominently. Only three months after entering into the contract, however, Lappin informed Cernuto that United would cease supplying the cabinets. Plaintiff alleges that Famous Furnace & Supply Co. (Famous), a retail store selling United cabinets in the same competitive area as Cernuto, complained to United about the discounter's price competition. Because this appeal concerns a grant of summary judgment, we must view the record in the light most favorable to the plaintiff, and consequently must infer that Famous' conduct was the cause of United's decision to terminate Cernuto's supply, and that Famous was motivated by direct price competition between it and Cernuto.[2]

Cernuto brought the present action against United, Lappin, and Famous, alleging, *inter alia,* conduct violative of § 1 of the Sherman Act. After completion of discovery and the filing of pretrial narrative statements, defendants moved for summary judgment on two counts of the complaint, including the Sherman Act claim. The district judge concluded that plaintiff could not recover on these counts and that there was no just reason for delay. He therefore entered a judgment as to both counts, and Cernuto took a timely appeal to this Court.[3]

* Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. After discovery was completed, plaintiff filed a pretrial narrative statement that did not, and presumably could not, allege the harmful economic effects necessary to make out a § 1 violation under the rule of reason analysis. Under Local Rule 5. II. G. of the Western District of Pennsylvania, such evidence may not be introduced at trial because of the pretrial narrative statement and plaintiff's position at pretrial conference.

2. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (non-moving party entitled to have

record viewed in the light most favorable to it). We note that summary judgment is to be used sparingly in complex antitrust litigation. *Id.*

3. The complaint included seven counts: one count charging violation of § 1 of the Sherman Act (count 1), two counts charging breach of contract (counts 2 and 3), a count charging wrongful cancellation of the contract (count 4), a recoupment count (count 5), a count alleging tortious interference with contractual relations (count 6), and a count alleging unfair trade practices (count 7). The district court granted summary judgment as to counts 1 and 6, and retained jurisdiction over the other counts. Only these two counts, then, are before this Court.

## II.

Because almost all business agreements may be interpreted as restraining trade to some degree, § 1 of the Sherman Act has been construed for the most part to proscribe only those combinations that "unduly" restrain trade. In the classical § 1 controversy, therefore, a "rule of reason" is applied, and the plaintiff must prove "that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets . . . ." [4] Thus, to demonstrate an antitrust violation under the "rule of reason" in the present case, Cernuto would have to show an actual anti-competitive impact on the sale of cabinets in Western Pennsylvania. However, Cernuto does not allege, and apparently cannot prove, such harmful effects. Other sources of cabinets were available, and it is clear from its pretrial narrative statement that plaintiff was not prepared to offer any market analyses at trial. Plaintiff's claim, therefore, is grounded entirely on the alleged *per se* illegality of the defendants' combination.[5]

The *per se* violations of the Sherman Act—those requiring no proof of an actually harmful impact—are specific exceptions to the general rule of reason. They were described by Justice Black in *Northern Pacific Railroad Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), as:

> . . . agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

Among those business practices that have been treated as *per se* violations are price fixing,[6] resale price maintenance,[7] group boycotts,[8] tying arrangements,[9] and certain types of reciprocal dealing.[10] The question we must consider is whether the conduct at issue here—a manufacturer deliberately withdrawing its product from a distributor that resold it for a price less than its competitors at the request of a competitor—should be classified as a *per se* violation of the Act. Following Justice Black's formulation, the activity under consideration in this case must be seen to have a pernicious effect on competition without having any redeeming virtue. The pernicious effect is apparent: one competitor has succeeded in excluding another from dealing in United cabinets through a combination with United and its agent, and, in so doing, has eliminated the possibility of price competition by the foreclosed dealer. Although this harm may have its impact solely in the market for United kitchen cabinets, rather than in the general market for kitchen cabinets, it is not for that reason, beyond the reach of the antitrust laws.[11]

---

**4.** *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir. 1977).

**5.** 448 F.Supp. 1332, 1334 (W.D.Pa.1978). *See* note 1 *supra.*

**6.** *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**7.** *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

**8.** *Klors, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**9.** *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

**10.** *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

**11.** Interbrand competition—competition between manufacturers of different brands of the same commodity—has been labelled the "primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n.19, 97 S.Ct. 2549. Nonetheless, intrabrand competition—competition between sellers of the same product produced by a single manufacturer—has not been of so little importance as never to merit the protection of a *per se* rule. *See, e. g., United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (Chevrolet automobiles); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80

The difficult problem here, as we read the case law, is whether the business decision that has been brought into question has the same redeeming pro-competitive virtues that have been relied upon in rejecting a *per se* rule in other arguably similar cases. The conduct at issue, it might be said, is merely a decision by a manufacturer to terminate a customer. It is therefore, the argument goes, comparable to the conduct at issue in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), a case notable for the importance the Supreme Court placed on the pro-competitive aspects of the manufacturer's marketing plan. There, the Court upheld the right of a company to terminate a distributor of its television sets when that distributor began to sell them at an outlet outside of its allotted territory. The Supreme Court reasoned that the manufacturer's exclusive-franchise marketing plan was in fact beneficial to competition among the various television manufacturers and should therefore be governed by a "rule of reason."

■ For the most part, the Supreme Court has been disinclined to apply harsh or rigorous rules when reviewing unilateral decisions made by a single manufacturer in arranging its distribution structure. The interest of the manufacturer in controlling the marketing of its own product has been thought to justify restrictions on those who distribute it, or those who would like to do so. Thus, a manufacturer may sell its product to whomever it wishes, and a unilateral refusal to deal has not been considered to be a violation of the Act.[12] Moreover, a manufacturer may include in its marketing strategy certain restraints designed to improve its overall competitive position. Nor is it either uncommon or illegal for a manufacturer to enter into contracts that provide particular customers exclusive rights to sell the product in designated geographical areas.[13] And, under certain circumstances, a manufacturer may change its strategy, franchising new dealers or substituting new dealers for less productive old ones.[14] The result in *GTE Sylvania*, then, is not out of keeping with the law's traditional tolerance of unilateral decisions on the part of a manufacturer.

■ The ultimate reach of the *GTE Sylvania* decision is still uncertain, and continues to be a subject of considerable controversy,[15] but we are not persuaded that the

---

S.Ct. 503, 4 L.Ed.2d 505 (1960) (Parke, Davis pharmaceutical products).

**12.** *See, e. g., United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

**13.** [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods . . . .
*United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *overruled on other grounds, Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

**14.** ". . . [I]t is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A."
*Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3d Cir. 1972).

**15.** It might be argued that *GTE Sylvania*, if pressed to its logical conclusion, may be read to undermine all *per se* rules applied to primarily vertical restraints. *Cf.* Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum. L.Rev. 979, 987 (1977) (questioning continuing validity of a previous decision); Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision*, 45 U.Chi. L.Rev. 1 (1977) (evaluating effect of *GTE Sylvania* on precedents other than *Schwinn*). It should be noted however, that the *GTE Sylvania* Court was careful to preserve the *per se* analysis traditionally applied to cases involving price-fixing or resale price maintenance, 433 U.S. at 51 n.18, 97 S.Ct. 2549, and we believe it would be ill advised to presume that so radical a change in existing law as the abolition of *per se* rules in all arguably vertical cases was intended, absent an express declaration to that effect. Moreover, although we are confronted here with an apparently vertical conspiracy, the principal impact of that conspiracy, as we note *infra* at page 168, is horizontal rather than vertical in nature.

law's tolerance of reasonable restraints designed to improve the manufacturer's competitive position may be converted into a blanket allowance of *any* marketing decision made by a manufacturer. As Professor Sullivan has suggested in his treatise on the antitrust laws:

> "It does not follow from the fact that a manufacturer may, when franchising a dealer, commit itself not to franchise another in a territory defined by the manufacturer, that it may, having earlier franchised two or more dealers, agree at the request of one to terminate the others." [16]

When a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might be. This Court recently observed in a different context:

> Particularly where the refusal to deal is not unilateral but rather is prompted by an understanding with other parties, an antitrust violation may be found, *either by application of* a per se *rule* or through a 'rule of reason' analysis.[17]

Thus, to the extent that the conduct here differs from the conduct held to be justifiable in other cases involving manufacturer decisionmaking, application of a *per se* rule may be warranted.

Two of the most crucial differences between the conduct under consideration here and other accepted manufacturer actions are, upon analysis, readily apparent. When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. This would appear to be the rationale of the *GTE Sylvania* decision. However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.

The importance of the horizontal nature of this arrangement is illustrated by *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Although General Motors, the manufacturer, was seemingly imposing vertical restraints when it pressured recalcitrant automobile dealers not to deal with discounters, the Supreme Court noted that in fact these restraints were induced by the dealers seeking to choke off aggressive competitors at their level, and found a *per se* violation, rejecting the suggestion that only unilateral restraints were at issue.[18] So here, if United and Lappin acted at Famous' direction, both the purpose and effect of the termination was to eliminate competition at the retail level, and not, as in *GTE Sylvania*, to promote competition at the manufacturer level. Accordingly, the pro-competitive redeeming virtues so critical in *GTE Sylvania* may not be present here.

■ Equally important, the motivating factor in Famous' efforts and therefore the resulting conspiracy was—at least according to Cernuto's theory of the case—price. The pre-eminence of price considerations in antitrust law was summarized recently by Justice Stevens:

> "Price is the 'central nervous system of the economy,' and an agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face." [19]

It is true that the alleged combination in the case at hand did not set prices at an

---

16. L. Sullivan, Antitrust, § 148 (1977).

17. *Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 142 (3d Cir. 1978) (emphasis added).

18. 384 U.S. at 144–45, 86 S.Ct. 1321. *General Motors*, like the present dispute, involved a combination with conspirators at different lev-

els of the distribution chain. Unlike this case, however, there was more than one conspirator at the dealer level.

19. *United States v. National Society of Professional Engineers*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

exact level. But such a traditional conspiracy is not a *sine qua non* of a *per se* violation of the Act under the price-fixing rubric. If the purpose and effect of the challenged conduct is to restrain price movement and the free play of market forces, it is then illegal *per se.* As the Supreme Court stated in the celebrated price-fixing case, *United States v. Socony-Vacuum Oil Co.*:

> Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they . . . stabilized prices they would be directly interfering with the free play of market forces.[20]

Cernuto's pretrial narrative statement points to the centrality of price in the combination of Famous, Lappin, and United to cut off plaintiff. The thrust of Famous' communication to United, it is alleged, was "that [Cernuto] was selling United products in Famous' territory and that [Cernuto] was a low price volume dealer."[21] Cernuto is a "discount house", and, it must be presumed, was prepared to sell United cabinets at prices lower than those offered by Famous. Famous' concern, understandably, was that Cernuto's low prices would force Famous' own prices down if it were to compete effectively in selling United cabinets. By prevailing upon United and Lappin to terminate their contract with Cernuto, Famous effectively eliminated the threatened competition and was able to maintain prices at its own preferred levels. It is just this type of conduct that the antitrust laws were designed to reach.

There are, it must be noted, a scattering of cases suggesting a result contrary to the one we reach today. The best known is the so-called *Packard* case.[22] There, the most

successful car dealer in the Baltimore area threatened to cease selling the manufacturer's automobiles unless the dealer's competitors were terminated and it was granted an exclusive right for the entire region. The manufacturer was not in a strong enough overall competitive position to resist the demand of this dominant dealer, and acquiesced. Notwithstanding the horizontal impact of the dealer's action, the court reversed a jury verdict for plaintiff and refused to find an antitrust violation on the part of the manufacturer. A more recent case is *Oreck Corp. v. Whirlpool Corp.*[23] There, the Court of Appeals for the Second Circuit, sitting *en banc*, reversed a jury verdict for a plaintiff that had been deprived of its profitable trade in Whirlpool vacuum cleaners, as a result of an agreement between Whirlpool and Sears & Roebuck Co., the plaintiff's principal competitor. The court found the trial judge's instructions to the jury, which left open the possibility of finding a *per se* violation on such facts, to be erroneous, and remanded for a new trial—presumably under a rule of reason analysis.

As a preliminary matter, we are not convinced that this Court would necessarily have decided *Packard* and *Oreck* the same way had we been presented with the identical factual configurations. But whatever result we might have reached in such situations, those two cases are distinguishable from this one. *Packard,* often criticized on its own facts, dealt with a manufacturer that was struggling to maintain a declining competitive position, and is frequently explained as an example of the failing-company doctrine. Moreover, in *Packard* the dealer was seeking not to fix prices but to secure an exclusive franchise, a form of marketing strategy that is not without cer-

---

**20.** 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940).

**21.** 53a.

**22.** *Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). *See also Schwing Motor*

*Co. v. Hudson Sales Corp.,* 138 F.Supp. 899 (D.Md.), *aff'd,* 239 F.2d 176 (4th Cir. 1956), *cert. denied,* 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

**23.** 579 F.2d 126 (2d Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

tain overall competitive advantages. In contrast, Famous was not the exclusive dealer of United products in Western Pennsylvania and, at least as far as the record shows, was not seeking such a position. Instead it was desirous of eliminating a dealer that was providing price competition.

Similarly, in *Oreck* there was no proof that Sears, the aggressive dealer, was inspired by price. In fact, Sears was selling Whirlpool vacuum cleaners at prices below those offered by plaintiff Oreck.[24] Price control, then, was not the likely purpose of the Whirlpool-Sears agreement. Furthermore, Whirlpool did no more than refuse to renew a contract with Oreck, whereas here United breached its two year contract with Cernuto after only three months. Whirlpool's decision may be considered to be more an element of its own marketing strategy, in contradistinction to United's decision, which, given the sudden repudiation of a recently made agreement, is alleged to have been predominantly the result of customer pressure.

■ Thus, despite *Packard* and *Oreck*, the situation present in this case may be fairly considered to raise the possibility of a *per se* violation of the Sherman Act. Given the alleged anti-competitive and arguably horizontal impact of United's decision, and given the price orientation of the alleged conspiracy, we cannot say that a *per se* violation of the Act may not be shown. If Cernuto can prove at trial that United, Lappin and Famous conspired to protect Famous from price competition by Cernuto, and that United and Lappin terminated Cernuto at Famous' request and in pursuit of a price related end, then it can prevail on a price-fixing theory notwithstanding its failure to show any impact on competition involving kitchen cabinet sales in Western Pennsylvania. Of course, at trial the defendants may be able to demonstrate that the evidence does not at all conform to what plaintiff has alleged. If it could be shown, for example, that United's decision to terminate Cernuto was in fact its own— the result of its own marketing strategy and judgment—then notwithstanding Famous' actions, the alleged conduct would be essentially unilateral in nature and might be found to possess the pro-competitive redeeming virtues that would defeat the application of a *per se* rule.[25] Similarly, if defendants can demonstrate that their actions were not motivated solely by considerations of price then the use of a *per se* rule might be inappropriate. But at present—in reviewing a grant of summary judgment— we must assume that the facts are otherwise. Under these circumstances, a *per se* application of § 1 of the Sherman Act may well be warranted.

### III.

The other count of the complaint ruled upon by the district court alleges tortious interference with a business contract. All parties are agreed that our resolution of this question must turn on whatever decision is reached on the antitrust claim. Pennsylvania has adopted § 766 of the Restatement of Torts[26] which applies only to those who act "without a privilege to do so." Lappin maintains that under § 771 of the Restatement[27] it had such a privilege,

24. *Id.* 130.

25. On the other hand, if United acted in pursuit of its own policy, but that policy was itself a form of resale price maintenance, involving other parties in its enforcement, it might constitute a *per se* violation of the Act under *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), and an antitrust violation may be made out, albeit under a slightly different rubric than the parties have argued heretofore.

26. Section 766 of the Restatement of Torts reads:

Except as stated in Section 698, one who, *without a privilege to do so*, induces or otherwise purposely causes a third person not to
(a) perform a contract with another or,
(b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.
(emphasis added).

27. Section 771 of the Restatement of Torts reads:

One who purposely causes a third person not to enter into or continue a business relation with another in order to influence the other's

but acknowledges that the privilege would be destroyed were its actions found to be violative of the antitrust laws.[28] Because we have concluded that an antitrust violation might be found, we shall reverse the district court's judgment on the sixth count of the complaint as well as on the first.

The judgment of the district court will be reversed, and the case will be remanded for action consistent with this opinion.

policy in the conduct of his business is *privileged, if*

    (a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and

    (b) *the desired policy does not illegally restrain competition* or otherwise violate a defined public policy and

    (c) the means employed are not improper. (emphasis added).

**28.** Appellee's Brief at 13-14.