Robert A. **MORRISON** d/b/a Morrison Enterprises, Plaintiff,

v.

**MURRAY BISCUIT COMPANY, Defendant.**

No. S 82–349.

United States District Court, N.D. Indiana, South Bend Division.

Sept. 13, 1985.

David B. Weisman, South Bend, Ind., for plaintiff.

Cory Brundage, Debra S. Easterday, Indianapolis, Ind., Thomas F. Lewis, Jr., South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This is a civil action seeking damages for alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff filed this case on July 16, 1982. Both parties conducted extensive discovery. A waiver of jury trial was received from both parties and the court ordered, on July 27, 1984, the case tried as a bench trial. On March 5, 1985, in open court, the parties (by counsel) stipulated to bifurcation of the issues of liability and damages. All depositions were ordered published and were admitted into evidence without objection. The parties also stipulated that the issue of liability would be tried to the court. Finally the parties stipulated that the evidence on the issue of liability would consist of the exhibits admitted in evidence and the depositions published and admitted in evidence. The

plaintiff filed a brief on the issue of liability on May 11, 1985, this was followed by defendant's brief on the issue of liability filed on July 15, 1985, and plaintiff filed a reply brief on August 5, 1985. Both parties presented oral argument on the issue of liability to the court on August 8, 1985. The court now finds facts and states its conclusions of law thereon in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## I.

### FINDINGS OF FACT

Although there are no specific allegations of facts regarding a nexus to interstate commerce this court finds sufficient support in the record to reach an inference of a nexus to interstate commerce.

Plaintiff, Robert A. Morrison d/b/a Morrison Enterprises (Morrison), is a self-employed distributor of cookies and crackers. Morrison began serving the South Bend, Indiana area in that capacity approximately 26 years ago. Prior to that time Morrison was employed as a driver for other baked goods distributors in the South Bend area for approximately 6 years. These years of experience in the business provided Morrison with knowledge of the way in which the manufacturer/distributor/customer relationship functioned. In addition, Morrison gained knowledge of the limits under which the industry functioned. A pertinent example of this type of knowledge occurred when Morrison was employed by a bread distributor and discovered that before calling on a "chain" store [1] a distributor or his agent must contact the home office of the chain store and receive permission to call on the store. This limitation exists because often the home office purchases through a brokerage or distributor located in the same geographical center as the home office. In this case Morrison's knowledge of such limitations coupled with the oral instructions to him not to call on stores whose home office or warehouse was locat-

---

1. In Morrison's deposition he referred to the Basics store as a chain store. Basics is one of

the affiliates of the Certified warehouse in Chicago, Illinois.

ed outside the South Bend area should have been sufficient to avoid the alleged problems.

During Morrison's 26 years as a self-employed distributor, the area he served grew to include a fifty mile radius from South Bend, Indiana. The length of time Morrison worked in this field and the extent of the area he served clearly indicate that he was fully aware of which stores were affiliated with specific chains or warehouses.

Defendant, Murray Biscuit Company (Murray), is an unincorporated division of Beatrice Foods, Inc., and is authorized to do business in Indiana. Murray is a manufacturer of cookies and crackers. Murray utilizes both "brokers" and "broker-distributors" to sell and distribute its products.

A broker is distinguished from a broker-distributor in several ways. A broker does not take possession of the goods which he sells to his clients. The broker merely "services"[2] accounts and places orders directly to Murray for the client. In addition, the broker is not directly involved in the delivery of goods to the purchaser, nor does the broker collect payments on accounts. All delivery of orders placed by brokers was accomplished utilizing Murray's labor force and equipment. The price at which all brokers offer Murray's products is unilaterally determined by Murray. In general this determination is made by summing Murray's cost of manufacturing, labor, equipment, warehousing, and the commission which the broker was to receive from Murray. Brokers are special agents of Murray whose authority was limited to coordinating orders of Murray products for the broker's clients.

A broker-distributor, acting in a distributor capacity, purchases goods directly from Murray. The broker-distributor takes possession of the goods. Murray delivers the goods to the broker-distributor's warehouse. The broker-distributor in turn delivers the goods to the individual purchasers utilizing the broker-distributors' labor and equipment. The only significance of the term broker in the title broker-distribitor is that the price paid for goods delivered to his warehouse is the price at which all brokers could offer to any other client. The broker-distributor would receive a commission for goods sold, including any sales to his own warehouse. Murray did not control nor did they attempt to control the price at which a distributor could offer Murray products. In general the considerations a broker-distributor included when determining the price of goods were the cost to purchase the goods from Murray, and the broker-distributor's expenses for labor, equipment, and warehousing.

Morrison discovered that Murray products were available and decided to seek a distributorship. In his quest for such a distributorship Morrison called Mr. David Feldman, of Feldman Brokerage Company (Feldman), in Chicago, Illinois.[3] When Morrison was connected with Feldman's office he was informed that Mr. Lester Riggs (Riggs) was present in the office. Riggs at that time was brokerage sales manager for Murray, and his responsibilities included regular visits to Feldman's Company. The brokerage sales manager also has authority to appoint or terminate brokers and broker-distributors. This authority was subject to approval or order of the vice-president in charge of sales. Feldman put Riggs on the telephone to talk with Morrison. Morrison inquired about an appointment as a Murray distributor for the South Bend, Indiana area. Riggs in turn made inquires regarding Morrison's experience and the area Morrison was presently serving. Morrison explained his experience and described the area he served as including a fifty mile radius around South Bend, Indiana. Feldman objected to Riggs appointing Morrison to serve the South Bend area because Feldman has representatives work-

---

2. Servicing accounts includes personally calling on the client's stores to discuss the individual store's needs and problems.

3. The record does not indicate a specific date on which the telephone call was made. It is inferred from the facts that it was within two weeks of March 5, 1980, the date of the letter of appointment.

ing in the area. Riggs, however, felt Morrison could expand Murray's market penetration. Riggs did not want to create intrabrand competition and instructed Morrison that he was appointing him as a distributor in the South Bend area but Morrison was not to call on stores which were already established Murray customers. Riggs told Morrison a letter confirming the appointment would be sent. The letter of appointment dated March 4, 1980 described the assigned territory as including a fifty mile radius around South Bend, Indiana,[4] but did not include the restrictions concerning already established Murray customers.

Although the letter of appointment did not include the restrictions involving already established Murray customers, Morrison was not assigned an exclusive territory. Murray's market share was only 1 to 1.5 percent of the national market, in a market dominated by two major companies who comprised 40.66 percent of the market in 1983. To prevent intrabrand competition and stimulate interbrand competition, Riggs orally placed restrictions on the territory assigned to Morrison. These restrictions are pertinent in this case. Specifically the restriction on calling on stores affiliated with Certified warehouse located in Chicago, Illinois. The Certified warehouse was within Feldman's territory and had been his client for approximately 20 years. The Certified warehouse served several groups of stores in the greater Chicago and Northwest Indiana area. Morrison, by his admission, continuously called upon stores affiliated with the Certified warehouse.

Mr. Craig Williams (Williams), a Murray sales representative, was assigned responsibility for the territory assigned to Morrison. Williams verified the fact that Morrison was cognizant of the restrictions placed upon him. Morrison denies receiving any instruction concerning calls on Certified

warehouse affiliates before March or June 1981. However, Williams and Morrison discussed the restrictions during Williams' first visit to work with Morrison. Williams visited this territory every 3 to 4 months. Consequently, Morrison was cognizant of the restrictions not later than June 1980.[5]

Morrison was given an "Outstanding Sales Achievement" award which suggests that Riggs' feeling about the potential market for Murray products in the South Bend area was correct. Williams pointed out that during that same period of time there were complaints from Morrison's customers. The complaints concerned Morrison's service of accounts. The customers voiced complaints involving overloading the complaintant's store with merchandise or unauthorized use of shelf space which had been specifically assigned to another manufacturer's products. Williams also described incidents which involved other brokers or distributors where Morrison had called upon stores who had been established clients of other Murray brokers or distributors. Although Williams believed those incidents had been resolved, Morrison stated at least one had never been resolved.

The controversey in this case focuses on a letter of termination dated November 16, 1981, and the alleged related incidents preceding the drafting of that letter. The letter is from Mr. Bill Eddins (Eddins), who became brokerage sales manager on September 14, 1981, succeeding Riggs. The November 14, 1981 letter was addressed to Morrison and was intended to terminate Morrison's relationship with Murray. The stated reason was "repeated violations of your agreement with Murray Biscuit Company." The letter went on to list two types of violations. The first type was continually calling on customers affiliated with the Certified warehouse. The second type was "utilizing confidential information to

---

**4.** It is not clear whether the 50 mile radius is a description which Riggs originated or whether it was merely in response to Morrison's description of the area he was then serving.

**5.** June 1980 is an interpolation from information contained in the deposition of Mr. Craig Williams, and the letter from Mr. Lester Riggs to Mr. Robert Morrison dated June 25, 1980. It should be noted that this is the latest possible date and Morrison could have had personal knowledge of the restrictions as early as March 1980.

undercut prices." On this record there is ample evidence, including Morrison's admission, that Morrison continuously called on Murray customers affiliated with the Certified warehouse in Chicago, Illinois as well as other established Murray customers of other brokers or distributors. Regarding the second type of violation no demand to terminate Morrison was ever made by any broker to Murray concerning any Morrison activity which might have involved price cutting. The author of the precise price cutting language is disputed by Riggs and Eddins, the two Murray employees responsible for the decision to terminate Morrison. The author of the specific language is not material to the result reached by this court, since there is no evidence of any threat to terminate Morrison if he did not stop undercutting prices; nor was there any evidence that a demand or request to terminate Morrison was made as a result of any alleged price cutting.

There were requests made to Murray to have Morrison cease calling upon persons who were already established Murray customers. Most recently, Feldman called Riggs, in October 1981, and complained that someone was calling upon stores affiliated with his client Certified warehouse. At the time of the call Feldman did not know the identity of the person he was complaining about. Feldman also forwarded a copy of the "presentation" made to the store to Riggs. Riggs subsequently called Eddins on November 16, 1981 and informed him of the breach of Morrison's agreement with Murray. Riggs told Eddins that as brokerage sales manager it was his responsibility to terminate Morrison regardless of the length of time Eddins had been brokerage sales manager. Eddins drafted the letter according to Riggs' instructions and Morrison was terminated.

## II.

### CONCLUSIONS OF LAW

This court has jurisdiction over the parties and subject matter of this cause of action under Section 1331 of Title 28 of the United States Code and venue is proper under Section 1391 of Title 28 of the United States Code.

■ The Supreme Court of the United States, in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) announced the standard required to prove a contract, combination or conspiracy in violation of Sherman Antitrust Act, Section 1. The Court held that the antitrust "plaintiff must present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 1471; citing, *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946) (Circumstances must reveal a "unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement.") The standard announced in *Monsanto* has been described as requiring evidence which tends to exclude the possibility of independent action. Therefore the burden is on the plaintiff to present direct or circumstantial evidence which excludes the possibility of independent action by the manufacturer.

■ The evolution of the application of the Sherman Antitrust Act is illustrated by two lines of cases. One line controls litigation under contracts, combinations, or conspiracies which rise to the level of being *per se* illegal. See *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Fashion Originator's Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944); *Timken Co. v. United States*, 341

U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *United States v. Parke-Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). The other line controls litigation where a contract, combination, or conspiracy does not rise to the level of *per se* illegal and is analyzed under the Rule of Reason. *See Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Traditionally, *per se* treatment is reserved for that type of conduct which the courts through experience have found to have a pernicious effect on competition. *Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The test has also been described as looking for a practice which "facially appears to be one that would always or almost always restrict competition and decrease output". *Broadcast Music, Inc. v. Columbia Broadcast Sys. Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979); accord, *Continental T.V., Inc v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Activities which the Supreme Court of the United States has found to be *per se* violations of § 1 of the Sherman Act include horizontal price-fixing, horizontal market-allocations, group boycotts, tying agreements, and certain vertical price-fixing agreements because they involved concerted action which had a pernicious effect on competition. *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Fashion Originator's Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951);

*United States v. Parke-Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). *See also Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir. 1981); *Vogel v. American Soc. of Appraisers*, 744 F.2d 598 (7th Cir.1984). The Rule of Reason analysis, which requires an evaluation of the effect of the conduct upon the relevant market, is applicable to all other types of challenged activity. *Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Moore v. Boating Industry Associations*, 754 F.2d 698, 706 n. 12 (7th Cir.1985). This series of cases shares two important characteristics. First there was concerted action and second that concerted action had a pernicious effect on competition.

In this case the plaintiff alleges that the actions of the defendant are *per se* violations. "The plaintiffs attachment of the *per se* label is simply inadequate in itself to sustain the complaint, the defendants alleged activity must be scrutinized to determine whether such characterization is appropriate." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984); citing, *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir.1983). Consequently, this court has independently scrutinized the activity to determine if the *per se* label is appropriate.

The facts of this case do not create a *per se* violation either of horizontal price-fixing or horizontal market-allocation. To find any horizontal agreement the parties to the agreement must occupy the same level in the manufacturer/broker/broker-distributor hierarchy. *Valley Liquors v. Renfield Importers, Ltd.*, 678 F.2d 742, 744 (7th Cir.1982). *See United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

The parties to the alleged agreement do not occupy the same level in the heirarchy. Therefore, there is no horizontal *per se* violation.

This case may be characterized as a distributor-termination. The Supreme Court of the United States recently announced two important distinctions which must be analysed in such cases. The distinctions are those between concerted action to set prices, and concerted action on non-price restrictions. *Monsanto Co. v. Spray-Rite Services Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). This court will first address whether there was concerted or independent action to set prices. The plaintiff alleges that the defendant and a broker acted in concert to terminate the plaintiff and thereby fix prices.

■ The acts may be characterized in either of two ways. First, brokers can be analogized to employees of Murray. Although the brokers are apparently independent contractors, acting as special agents of Murray, they perform the functions that an in-house sales force would perform. This characterization precludes a violation of Section one of the Sherman Antitrust Act because "officers or employees of the same company can not conspire for the purpose of antitrust violations." *Brunswick v. Riegel Textile*, 752 F.2d 261 (7th Cir.1984), Citing, *University Life Insurance v. Unimarc*, 699 F.2d 846 (7th Cir. 1983). The second characterization is that the brokers are a level below the defendant in the vertical hierarchy. In that characterization the relationship between the defendant and defendant's broker is vertical. The plaintiff alleges that the vertical restrictions amount to horizontal price restraints which would trigger the *per se* rule.

■ The plaintiff relies on *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir.1979) to support their allegation of horizontal impact achieved through vertical restraints, which is intended to support the claim of horizontal price-fixing. *Cernuto* does not declare that all horizontal impacts

of a vertical restraint are *per se* violations of Section One of the Sherman Antitrust Act. *Cernuto* merely raises the possibility that a factual situation might exist which would rise to the level of pernicious effect that would be deemed a *per se* violation. The Court of Appeals for the Seventh Circuit, in dictum, indicated that if the proper case presented itself the court would follow *Cernuto*. *Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1226 (7th Cir. 1980). However, in *Alloy* the Court of Appeals points out that proof of an agreement to set prices is required before *Cernuto* would be applicable. *Id.* In a footnote the circuit court states that "[a] unilateral purpose held by only one party to the agreement would not seem to meet that element of § 1 which requires an agreement of two or more persons." *Id.* at *1226* n. 6. The evidence indicates complaints by one broker but the broker did not know the identity of the person he was complaining about and did not demand termination. Furthermore, the complaint was not lodged for price-cutting but for violation of non-price restrictions. Therefore, the authority relied upon by the plaintiff is not controlling. The facts of this case do not meet the Seventh Circuit's requirement of proof of agreement to set prices. The direct evidence of this case illustrates a unilateral decision to terminate the plaintiff.

### III.

■ Not all vertical arrangements are considered *per se* illegal. Only those vertical arrangements which create a price-fixing scheme are considered *per se* violations. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir.1984). The guidance of the Supreme Court of the United States requires a court to quickly determine whether an agreement is clearly anticompetitive or lacks any deeming competitive virtues. *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 603 (7th Cir. 1984); citing *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979); *National Collegiate Ath-*

*letic Ass'n v. Board of Regents,* —— U.S. ——, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984). The plaintiff in the present case alleges a conspiracy to fix prices. The Supreme Court of the United States set the standard of evidence required to prove a claim of concerted price-fixing. *Monsanto* at 1470. At the same time the Court cautioned that "If an inference of such an agreement may be drawn from highly ambigious evidence, there is considerable danger that the doctrines announced in *Sylvania* and *Colgate* will be seriously eroded." *Id.* In addition the Court expressed concern that an inference of agreement "merely from the existence of complaints or even from the fact that termination came about 'in response to' complaints could deter or penalize perfectly legitimate conduct." *Id.* The facts of this case demonstrate that the defendant did set brokerage prices, had non-price territorial restrictions and terminated the plaintiff following a non-price complaint regarding violation of territorial restrictions. Plaintiff also relies on the statement in the termination letter that the plaintiff was a price-cutter to support the alleged violation of section one. However, a statement alone is not sufficient to meet the plaintiff's burden to prove a "meeting of the minds" or conscious design to terminate a price-cutter. Any setting of prices was unilateral. The brokers were special agents of the defendant and only had authority to sell the products at the price established by the defendant. This arrangement is the only logical method to determine broker prices since all costs and expenses, related to the price were strictly costs and expenses of the defendant. All of the variables, which were included in the price brokers could offer were actual costs which the defendant incurred in production, promotion, and distribution. In fact the plaintiff sets the prices at which he and his agents offer the products at by considering the similar variables. This type of price determination does not involve an agreement between either horizontal or vertical parties. The only variable in the price determination which might be considered as the product of an agreement is the rate of

commission. Therefore, with absolutely no possibility of agreement between the defendant and any of the defendant's brokers to fix the price of the defendant's products there can be no vertical conspiracy to fix prices.

It is clear from the record that the plaintiff was free to sell those goods which he acquired for sale through his distributorship at any price which he chose. There is no allegation nor any evidence that the defendant threatened to terminate the plaintiff for freely setting prices of products sold through his distributorship at any price which he chose. There is no allegation nor any evidence that the defendant threatened to terminate the plaintiff for freely setting prices of products sold through his distributorship.

## IV.

■ Non-price vertical restraints are analyzed by the Rule of Reason analysis. *Continental T.V., Inc. v. GTE Sylvania,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The rule of reason asks: "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

Vertical territorial restraints may inhibit intrabrand competition and at the same time promote interbrand competition. *GTE Sylvania,* 433 U.S., at 57–59, 97 S.Ct. at 2561–2562. The defendant's national market share was only 1 to 1.5 percent. In fact, due to the low market share in the South Bend area the defendant's brokerage sales manager appointed the plaintiff over the objection of a broker who had some accounts in that area. The restrictions placed on the plaintiff were territorial and were directed at decreasing intrabrand competition. This was to enable distributors to give greater attention to interbrand competition. The record demonstrates that this market strategy worked. The defendant's sales did increase in the South Bend

area. Therefore, the territorial restrictions had precisely the positive effect envisioned by the Supreme Court of the United States in *GTE Sylvania* and *Monsanto*. Furthermore there is no evidence of an increase in intrabrand prices beyond a reasonable competitive level.

The plaintiff asks this court to address a problem which resembles the one addressed by Judge Posner in *Valley Liquors*. The court is asked to exclude the possibility of unilateral action based on inferences of an agreement and ambigious evidence that the plaintiff was a price-cutting distributor. As in *Valley Liquors* if the defendant had had a desire to stimulate intrabrand competition, contrary to the defendant's restrictions on the plaintiff, then the defendant would not have terminated the plaintiff for repeated violations of those restrictions. *Valley Liquors* at 743. The antitrust laws do not prohibit a manufacturer from limiting distribution of its products "merely because its distributors went along so they would have less price competition." *Valley Liquors* at 744. Although there is no evidence to support any inference that brokers agreed to territory restrictions to have less price competition. Assuming there were, that alone would not be sufficient to violate § 1 of the Sherman Antitrust Act. *Valley Liquors* was decided before the Supreme Court's decision in *Monsanto*. However, the opinion in *Valley Liquors* does not violate the test of *Monsanto* but is wholly within the cautions which the Court expressed. The plaintiff asks this court to find that since a broker asked the defendant to stop the intrabrand competition and approximately one month later the plaintiff was terminated then they must have acted in concert. Those circumstances, in light of the evidence, are not sufficient to meet the *Monsanto* test. There must be evidence which tends to exclude the possibility that the defendant was acting to promote an independent conception of self-interest. *Monsanto* at 1469–1470. See also *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742 (7th Cir.1982). The burden is on the plaintiff to produce evidence which refutes the evidence of independent action. This court finds that there is no direct or circumstantial evidence which excludes the possibility of independent action by the defendant.

Accordingly and for the foregoing reasons this court finds that: (1) there was no horizontal agreement to set prices or for market-allocation, (2) there was no vertical agreement to set prices, (3) the vertical non-price restrictions are not unreasonable restraints on trade, and (4) there was no vertical agreement which had a horizontal impact of price-fixing. Therefore, Section one of the Sherman Antitrust Act has not been violated. It is ordered that judgment for the defendant, Murray Biscuit Company, be, and is hereby GRANTED. It is further ordered that costs shall be assessed in favor of the defendant, Murray Biscuit Company.