457 So.2d 1028 (1984)
ST. PETERSBURG YACHT CHARTERS, INC., a Florida Corporation, and St. Petersburg Yacht Charters  Ft. Myers, Inc., a Florida Corporation, Appellants,
v.
MORGAN YACHT, INC., a Nevada Corporation, Hirsh Sailing Yachts, Inc., a Florida Corporation, and Ronald L. Hirshberg, Appellees.
No. 82-2704.
District Court of Appeal of Florida, Second District.
May 4, 1984.
Rehearing Denied June 11, 1984.
*1031 F. Wallace Pope, Jr., of Johnson, Blakely, Pope, Bokor, & Ruppel, P.A., Clearwater, for appellants.
William F. McGowan, Jr., of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, for appellee Morgan Yacht.
Arthur D. Vandroff of Lancer, Vandroff & Sudakoff, Sarasota, for appellees Hirsh Sailing Yachts, Inc. and Ronald L. Hirshberg.
LEHAN, Judge.

SUMMARY OF FACTS, ISSUES, AND HOLDING
This suit brought under the Florida Antitrust Act of 1980 involves a dealership termination. The two basic issues may be stated as follows: Is a cause of action stated by a dealer's complaint alleging a manufacturer's termination of the dealership in conspiracy with a competing dealership which requested the termination to eliminate resale price competition? We hold that a cause of action is stated in this case. Is this alleged conduct a per se antitrust violation or must it be tested under the rule of reason? We hold that no per se violation is alleged in this case but that the rule of reason should apply.
An understanding of certain antitrust law terminology is essential to an understanding of this case. "Per se" antitrust violations may be established with relatively little proof. In general, only proof of particular conduct which is considered inherently pernicious is necessary. An unlawful effect of that conduct upon competition is presumed. On the other hand, "rule of reason" antitrust violations require proof relating to anticompetitive effects of the conduct alleged. "Interbrand" competition is among persons or firms dealing in the same generic product, e.g., TV sets. On the other hand, "intrabrand" competition is among persons or firms dealing in the product of one manufacturer, e.g., Sylvania TV sets. "Vertical" restraints upon competition are those imposed by persons or firms on a different level of the distribution system than the level of the persons or firms receiving the impact of the restraints, e.g., resale price fixing may involve a manufacturer dictating the price at which a dealer sells a product. On the other hand, "horizontal" restraints are those imposed within the same distribution level, e.g., by some dealers refusing to sell to other dealers. (In general, horizontal restraints are more susceptible of being labeled per se violations than are vertical restraints.)
Plaintiffs appeal from a dismissal with prejudice of Counts I and II of their amended complaint. We have jurisdiction pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(B).
St. Petersburg Yacht Charters, Inc. and St. Petersburg Yacht Charters-Ft. Myers, Inc. (both of whom are hereinafter called St. Pete) sued Morgan Yacht, Inc. (hereinafter called Morgan) and Hirsh Sailing Yachts, Inc. and its president, Ronald L. Hirshberg (both of whom are hereinafter *1032 called Hirsh). According to the amended complaint, defendant-appellee Morgan, a sailboat manufacturer, orally appointed plaintiffs-appellants St. Pete to be Morgan charter yacht dealers on the Florida west coast. Defendant-appellee Hirsh, a Morgan charter yacht dealer located in Manatee County, Florida, was a competitor of St. Pete in the sale of Morgan boats.
The amended complaint alleges that Hirsh complained to Morgan that St. Pete was underselling Hirsh and demanded that Morgan terminate St. Pete's dealership. It is alleged that Morgan thereafter terminated St. Pete as a Morgan dealer pursuant to an unlawful conspiracy by Morgan and Hirsh "to fix and stabilize the price of Morgan boats at a price higher than otherwise possible by eliminating plaintiffs as price competitors." It is additionally alleged that Morgan and Hirsh "intended for Hirsh ... to gain a competitive advantage over plaintiffs; to require plaintiffs to purchase all of their Morgan boats at a reduced discount through Hirsh ... and effectively remove plaintiffs as competitors in the sale of Morgan boats to third parties." The amended complaint alleges that the foregoing actions were "anti-competitive in intent and effect" and that, as a result, St. Pete was injured in particular alleged ways in its business. Treble damages, attorney's fees and an injunction are requested.
St. Pete alleges that its termination as a Morgan dealer under the foregoing circumstances constituted violations of the Florida Antitrust Act of 1980. The violations are alleged to involve section 542.18, Florida Statutes (1981) (the counterpart of section 1 of the Sherman Act, 15 U.S.C. § 1), and section 542.19, Florida Statutes (1981) (the counterpart of section 2 of the Sherman Act, 15 U.S.C. § 2).
Amended Count I alleges a per se violation of the antitrust laws and amended Count II under the same facts alleges an antitrust violation under rule of reason standards. We affirm the dismissal of Count I and reverse the dismissal of Count II. This is primarily a section 542.18, Florida Statutes (and therefore, section 1 of the Sherman Act) case. We do not consider the bare allegations of a violation of section 542.19, Florida Statutes (section 2 of the Sherman Act) to change our holding and therefore direct our attention to case law which principally concerns section 1 of the Sherman Act. Appellant does not argue section 2 of the Sherman Act as a separate cause of action.
The foregoing sections of the Florida Antitrust Act of 1980 are substantially identical to their counterparts in the Sherman Act. Section 542.18 provides:

Restraint of trade or commerce.  Every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful.
Section 542.19 provides:

Monopolization; attempts, combinations or conspiracies to monopolize.  It is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state.
Section 542.32, Florida Statutes (1981), provides:

Rule of construction and coverage.  It is the intent of the legislature that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable antitrust statutes... .
Accordingly, the Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act. Statutory interpretation is of little help in ascertaining Sherman Act violations. Reliance must be upon the case law which over the years has, however broadly and sometimes inconsistently, laid out the parameters of conduct proscribed by those antitrust laws.
The principal difference between the Florida Antitrust Act and the Sherman Act is that under the Florida act there is no jurisdictional requirement that interstate commerce be involved. See Hackett v. *1033 Metropolitan General Hospital, 422 So.2d 986 (Fla. 2d DCA 1982).
It appears that a vertically imposed restraint upon competition has been alleged. Therefore it is important to consider especially the U.S. Supreme Court's landmark opinion in Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which, while not involving the precise factual situation alleged here, does deal with the subject of vertical restraints. The Sylvania case represented a significant shift of direction in certain applications of section 1 of the Sherman Act. Federal courts have not been in agreement as to the effect, if any, of Sylvania on fact situations involving dealership terminations of the type alleged here.
The holding of Sylvania is summarized in Antitrust Adviser § 2.21 (C. Hills 2d ed. 1978), as follows (with our bracketed supplements):
In GTE Sylvania, the plaintiff distributor contended that the restricted location provision imposed on it by the defendant manufacturer [an alleged vertical restraint with which plaintiff did not comply and was, by alleged reason of that noncompliance, terminated as a Sylvania distributor] was per se unlawful under [United States v. Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)]. The trial court instructed the jury that such restrictions are per se unlawful, and a verdict was returned for plaintiff. The Court of Appeals for the Ninth Circuit reversed, holding that ... [the vertical restraint involved] should be judged according to the rule of reason.
On a writ of certiorari, the Supreme Court [affirmed], holding: ... (2) the Schwinn decision, appearing to hold ... [certain vertical restraints] to be per se unlawful, is economically unjustified and doctrinally unsound and is therefore overruled [and the Supreme Court reverted to the rule of reason standards articulated in Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), and reiterated in White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)[1]]; and (3) vertical resale restrictions, except those which involve price maintenance, must be judged in accordance with the rule of reason.

Id. at 119. (emphasis added)
The issues here principally relate to the third part of the Sylvania holding and involve whether St. Pete, by alleging a dealership termination of the type described in its amended complaint, has alleged a per se violation of the antitrust laws, has only alleged matters to be tested under the so-called "rule of reason," or has alleged no antitrust violation at all, as the trial court decided.
The parties have directed their arguments to a substantial extent toward the different interpretations which two federal cases have given, in light of Sylvania, to fact situations more or less like that alleged here. Those two cases are Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir.1979), which found a per se violation to exist, and Muenster Butane, Inc. v. The Stewart Co., 651 F.2d 292 (5th Cir.1981), which the trial court cited, which did not find a per se violation and which found a rule of reason analysis appropriate.
As pointed out above, Cernuto found a per se violation to exist under facts similar to the allegations here. It is relatively easy to explain and understand the Cernuto reasoning. Cernuto is to the effect that a termination of a dealership by a manufacturer at the request of a competing dealer for the purpose of affecting prices by eliminating the terminated dealer's competition is not simply a unilateral decision by the manufacturer, is pernicious, and is therefore a per se violation. Cernuto reasons that since a dealer requested the termination which horizontally affected another dealer, a per se unlawful horizontal group boycott was involved. Cernuto also reasons that since the effect of the termination *1034 was upon prices, per se unlawful price restrictions were involved. In view of the very simplicity of that reasoning, it is not simple to explain, as we undertake to do further below in this opinion, why Cernuto is incorrect in our view. Of course, simplicity of reasoning does not necessarily lead to correctness of result. And reasoning which is simplistic often does not produce the correct result. We believe that the Cernuto reasoning, while persuasive, has the effect of being somewhat simplistic. Also, antitrust case law often contains such broad principles of law that it is readily adaptable to citations in support of results not contemplated by the cases. We believe that Cernuto, in the final analysis, is an example of such an adaptation of citations. To explain why we believe Cernuto is incorrect and why citations of cases in seeming support of the Cernuto approach are not controlling, it is necessary to deal with several different aspects of the subject as we do in this opinion. It is necessary that we examine basic antitrust concepts; that we explain the impact of Sylvania which, while not directly in point, is the closest United States Supreme Court guidance which exists on the subject of intra brand competition which is involved here; and that we point out where we believe adherence to the Cernuto approach would lead in terms of the economy as a whole which in this context has reference to the efficiency of the distribution system for goods and services. In our view the Cernuto approach does not adequately take these types of aspects into account.
We agree with Valley Liquors, Inc. v. Renfield Importers, Ltd., 678 F.2d 742, 744 (7th Cir.1982), that there is at least "a certain unreality in the careful parsing of motives that Cernuto seems to require" and that Cernuto represents "pure antipathy to price competition." Valley Liquors was written by Judge Posner whose writing, as Professor Posner, on the subject was cited several times by the U.S. Supreme Court in Sylvania. We are not saying that Valley Liquors is direct authority for our holding in this case. Valley Liquors concerned a temporary injunction, and Judge Posner, referring to Cernuto, said that "the unraveling of this skein can be left for another occasion." Id. at 744. It could be said that our opinion in this case in a sense represents an undertaking to unravel the Cernuto "skein."
Muenster, decided after Cernuto, does not cite Cernuto. Although we shall direct our attention to those cases, we undertake an analysis somewhat broader than the analyses in those cases. Appellee also directs our attention to Professor Wesley J. Liebeler's discussion of this type of situation in the 1983 cumulative supplement to the Antitrust Adviser, supra.
Professor Liebeler in sections 1.32, 2.20, and 2.25 of that cumulative supplement provides a penetrating analysis of the antitrust ramifications of conduct involving dealership terminations under fact situations similar to the allegations here. He takes the position that Cernuto is wrong, i.e., that no per se violation is involved, and that Muenster is largely correct, i.e., that a rule of reason analysis may be required. His analysis also contains what appears to be a suggestion that under this type of fact situation the alleged conduct should not necessarily even be a violation of the rule of reason because a manufacturer's termination of one who deals in the manufacturer's product affects only intrabrand competition, and intrabrand arrangements and actions by a manufacturer may be considered beneficial to competition (i.e., interbrand competition) as a whole by increasing the efficiency of the distribution system. See, e.g., Antitrust Adviser § 2.20 (Supp. 1983) at 185, 204.
Accordingly, the trial court's ruling appears to be consistent with Professor Liebeler's suggestion. However, we believe that a portion of that ruling is inconsistent with antitrust law as presently established. We believe that Count I was correctly dismissed because no per se violation is stated but that Count II was incorrectly dismissed because a rule of reason violation is stated.
A premise with which we begin our analysis is that Sylvania reflects the proposition *1035 that the antitrust laws are primarily concerned with interbrand and not intrabrand competition. 433 U.S. at 51 n. 19, 97 S.Ct. at 2558 n. 19, 53 L.Ed.2d at 581 n. 19. To this Professor Liebeler subscribes. Antitrust Adviser § 2.20 (Supp. 1983) at 179. Professor Liebeler also believes that it is valid to principally consider the effects of vertical restraints as being upon intrabrand competition and to consider the effects of horizontal restraints as being upon interbrand competition. Antitrust Adviser § 2.20 (Supp. 1983) at 180. In this regard, and also indicating the nature of the puzzle created by Sylvania concerning the type of fact situation before us, are Liebeler's following statements:
In ... Sylvania ... the Supreme Court held that vertical customer and/or territorial restrictions on competition were to be judged under the rule of reason. Horizontal arrangements (those originating in agreements among the dealers) were to remain covered by the per se rule. The court did not believe that there would be serious problems in distinguishing between horizontal and vertical arrangements; thus, there would be no difficulty in deciding which arrangements should be governed by the rule of reason and which by the per se rule.
There were inconsistencies on this issue within the Sylvania opinion itself which have served to confound subsequent attempts by the lower courts to apply Sylvania. The principal problem in this area is that, at the same time it described horizontal arrangements as those that originated from agreements among resellers, it stated that interbrand competition (not intrabrand) was the primary concern of the antitrust laws. It seemed clear that the principal reason for applying the rule of reason to the arrangements involved in Sylvania was that those arrangements applied only to Sylvania brand television sets. Television sets made by other manufacturers were not involved.
The inconsistency arises because restrictions can be both horizontal  in the sense that they are originated by resellers  and intrabrand.
Antitrust Adviser § 2.20 (Supp. 1983), at 179.
In fact, one of the difficulties of the case before us is that St. Pete argues that horizontal restrictions are involved (because Hirsh, which allegedly was a cause of the termination, was a competitor of, and on the same distribution level as, St. Pete) while Morgan and Hirsh argue that only vertical restraints are involved (because it was the manufacturer, Morgan, which terminated its dealer, St. Pete). As explained below, we believe the conduct of which St. Pete complains should be treated as vertical in nature and that the mere involvement of Hirsh did not convert it into the type of horizontal conduct which is ordinarily considered to constitute a per se antitrust violation.
Our reasons for deciding that no per se violation is alleged and that a rule of reason violation is alleged may be summarized as follows:
A. The alleged conduct does not come within the generally accepted definition of per se violations. It is not manifestly anticompetitive, does not necessarily have a pernicious effect upon competition, and may well have the redeeming virtue of enhancing interbrand competition. Also, as further explained in section B below, the conduct is not a "price restriction," the term used in Sylvania's footnote 18 to identify conduct constituting per se violations which are specifically excluded from Sylvania's rule of reason approach to vertical arrangements.
B. The only two types of established per se violations which might potentially be involved here are so-called group boycotts and vertical price restrictions. We believe the alleged conduct is neither. No group boycott is involved because only one competitor of the terminated dealer was alleged to have induced the termination, and the effect appears to be the establishment of an exclusive dealer who is the winner over the terminated dealer in the competition for the dealership; no group of *1036 the terminated dealer's competitors was alleged to have conspired to cause the termination. No vertical price restriction is involved; although the action of Morgan in terminating St. Pete was vertical and prices are alleged to have been affected, no price restriction is alleged because no "price fixing" (a term which may be used interchangeably with "price restrictions"), in either a broad or literal sense of that term, is alleged as between either Morgan and St. Pete or Morgan and Hirsh. That is, no particular prices, or types of prices, to be charged by either St. Pete or Hirsh were alleged to have been required by Morgan.
C. The alleged conduct should be tested under antitrust case law applicable to unilateral refusals to deal, i.e., dealership terminations by manufacturers or other suppliers, which appears, under facts like those alleged here, to call for a rule of reason analysis. Terminations of dealerships by manufacturers are inherently lawful under the long-standing "Colgate doctrine." The alleged participation by Hirsh does not alter application of that doctrine because the termination remained primarily unilateral in nature in that, as stated above, no group boycott is involved. Also, the alleged effects of the termination upon prices do not alter application of that doctrine because, as stated above, no resale price restriction is alleged. Nonetheless, the allegations of anticompetitive effects should be tested under the rule of reason antitrust standard, and St. Pete should be given an opportunity to prove that an unreasonable restraint of trade exists.
The foregoing is our opinion in a relative nutshell. Sections of this opinion below designated A, B, and C explain our reasoning. Those sections are somewhat interrelated. We have undertaken to directly face various issues involved and to give fairly specific answers. The conclusion to be reached in this case does not appear to be subject to any directly controlling U.S. Supreme Court or Florida Supreme Court case law. Nor is it guided by consistent interpretations given by the federal appellate courts to antitrust law in cases which have come to our attention.
Those readers only interested in our holding and the basic reasons therefor may stop here. We have in Sections A, B, and C below set out our reasoning in some depth. Borrowing from the U.S. Supreme Court's language in Sylvania, "[t]his case presents important questions concerning the appropriate antitrust analysis" and is a "subject of considerable commercial importance." 433 U.S. at 37, 49, 97 S.Ct. at 2551, 2557, 53 L.Ed.2d at 579.
As pointed out below, the courts and commentators are not in agreement on the answers to two questions which go to the heart of this appeal and which bear strongly upon the foregoing reasons for our holding that no per se violation is alleged in this case: first, the correct application, if any, to be given to Sylvania under facts like those here and, second, the correct scope of, and standards by which to determine the nature of, per se antitrust violations.
Under Sylvania, vertical nonprice restraints are judged by the rule of reason. We conclude that the conduct involved in this case is, in the final analysis, vertical and nonprice. Our reasoning to support that conclusion is organized as follows:
In section A below we explain the basic definitions of conduct which is considered per se unlawful and that which is to be judged under the rule of reason. We explain why we believe the conduct involved in this case does not fall within the basic definition of per se unlawful conduct.
Section B discusses the only two established types of per se unlawful conduct which are even potentially involved in this case (group boycotts and price fixing). In section B(1) we explain why the conduct alleged here is vertical and is not the horizontal type of conduct, called a group boycott, which constitutes a per se violation. In section B(2) we explain that it is nonprice and is not price fixing which constitutes a per se violation. Section B(2)(a) analyzes why the conduct is not "price fixing" as that term is generally used in antitrust law. Section B(2)(b) deals with *1037 three cases, Cernuto, Muenster, and Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d 1226 (7th Cir.1982), cert. granted, 460 U.S. 1010, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983).[2]Cernuto and Spray-Rite are leading cases taking the position that conduct of the type alleged here constitutes a price restriction. We critique those cases and explain why we believe they are incorrect. We explain why Muenster, which was cited by the trial court, is consistent with our holding.
In section C we shift to a different starting point for analysis which is well-established in antitrust law and which also supports our conclusion that no per se violation is alleged in this case. As explained in section C, the conduct alleged here is no more than basically a unilateral refusal to deal which is not a per se violation under the "Colgate doctrine."

REASONING

A. The Alleged Conduct Does Not Come Within the Generally Accepted Definitions of Per Se Antitrust Violation.

In determining whether the dealership termination alleged in this case is to be tested under Sylvania's rule of reason standard for vertical arrangements, it is necessary to determine whether it should constitute a per se unlawful "price restriction" which Sylvania excluded from its rule of reason approach. In order to do so the term "per se price restriction" should be examined in its separate parts. This involves three questions as to the conduct alleged in this case: (1) is it the type of conduct which comes within the definition of per se offenses? (2) is it a restriction in the way that term is meant in Sylvania? and (3) is it conduct involving price in the way in which that term is meant in Sylvania, to wit, "price fixing," in even the broadest sense? We believe the answer to each of the three questions is no. In this section A we principally address questions (1) and (2). Question (3) is addressed in section B(2) below. Section B examines types of conduct which the case law has found to be per se violations and explains why the conduct alleged here does not correspond to those types of conduct. Since "price fixing" is one of those types, to avoid redundancy we deal with it in section B(2), rather than here.
One page of Sylvania, in text and footnotes in the Supreme Court Reporter, quoted below, may provide as clear an explanation of the rather nebulous difference between per se violations and rule of reason violations of the antitrust laws as can be found in one place. Antitrust law, in the federal sense, is new to Florida law, and there are few Florida cases dealing with it. Also, our holding is meant to be keyed to antitrust law basics. Therefore, we set out here in full that explanation. Rule of reason violations are described as follows:
Section 1 prohibits "[e]very contract, combination .. . or conspiracy, in restraint of trade or commerce." Since the early years of this century a judicial gloss on this statutory language has established the "rule of reason" as the prevailing standard of analysis... . Under this rule, the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.
433 U.S. at 49, 97 S.Ct. at 2557, 53 L.Ed.2d at 580. At that point footnote 15 is cited, which reads:
The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may *1038 suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable, the history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse, but because knowledge of intent may help the court to interpret facts and to predict consequences.
433 U.S. at 49 n. 15, 97 S.Ct. at 2557 n. 15, 53 L.Ed.2d at 580 n. 15.
On the other hand, per se violations are described as follows:

Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. As the Court explained in Northern Pacific ..., there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.
433 U.S. at 50, 97 S.Ct. at 2557, 53 L.Ed.2d at 580. At that point footnote 16 is cited which reads:

Per se rules thus require the Court to make broad generalizations about the social utility of particular commercial practices. The probability that anticompetitive consequences will result from a practice and the severity of those consequences must be balanced against its procompetitive consequences. Cases that do not fit the generalization may arise, but a per se rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them. Once established, per se rules tend to provide guidance to the business community and to minimize the burdens on litigants and the judicial system of the more complex rule-of-reason trials . .., but those advantages are not sufficient in themselves to justify the creation of per se rules. If it were otherwise, all of antitrust law would be reduced to per se rules, thus introducing an unintended and undesirable rigidity in the law.
433 U.S. at 50 n. 16, 97 S.Ct. at 2557 n. 16, 53 L.Ed.2d at 580 n. 16.
Under the foregoing definition of a per se violation, we cannot say that a vertical termination by a manufacturer (like Morgan) of a dealer (like St. Pete) which inhibits the dealer from continuing to sell that manufacturer's product, and which may have obvious intra brand effects, has an inherently pernicious effect upon competition, whether or not done with a motive of affecting prices, e.g., to eliminate a dealer who is cutting intrabrand prices. Although the effect of a termination of that kind upon intrabrand prices may in some cases be clear, "[i]nterbrand competition ... is the primary concern of antitrust law." Sylvania, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19, 53 L.Ed.2d at 581 n. 19. "In this context courts have frequently noted that the antitrust laws are designed to regulate and safeguard competition, but not to protect an individual injured competitor." 16A von Kalinowski, Business Organizations, Antitrust Laws and Trade Regulation, § 6C.02[2] (1982).
Although Sylvania did not address the type of fact situation now before us, Sylvania, by its recognition of the potentially beneficial effects of intrabrand restraints, appeared to recognize that there is nothing inherently (or per se) wrong with them. In fact, as explained below, Sylvania may be interpreted to justify the conclusion that all vertical restraints, except vertical price fixing, e.g., the reselling by dealers at prices dictated by the manufacturer, and except those resulting from group boycott activities of other dealers (which are not referred to in Sylvania), are not per se violations. That is, actions by a manufacturer, except those referred *1039 to above, with respect to the initial arrangement with its dealer, to its course of business with its dealer, and to its terminations of its dealer, should be tested under the rule of reason in order to ascertain whether antitrust illegality is involved.
As Sylvania says, referring to vertical, intrabrand restrictions, those types of restrictions may actually be beneficial:
Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These "redeeming virtues" are implicit in every decision sustaining vertical restrictions under the rule of reason.
433 U.S. at 54, 97 S.Ct. at 2560, 53 L.Ed.2d at 583.
In sum, we conclude that the appropriate decision is to return to the rule of reason that governed vertical restrictions prior to Schwinn.

433 U.S. at 59, 97 S.Ct. at 2562, 53 L.Ed.2d at 585.
A termination of a dealer is a "restriction" on competition in the sense that it eliminates the competition of the terminated dealer. But it is not a restriction on the type of competition carried on by the dealer in the sense that, as explained below, we believe Sylvania uses the term "vertical restrictions."
In the very significant footnote 18 of Sylvania, the Supreme Court said:
We are concerned here only with nonprice vertical restrictions. The per se illegality of price restrictions has been established firmly for many years and involves significantly different questions of analysis and policy... . [R]esale price maintenance is not only designed to, it almost invariably does in fact, reduce price competition not only among sellers of the affected product, but quite as much between that product and competing brands.
433 U.S. at 51, 97 S.Ct. at 2558, 53 L.Ed.2d at 581 (emphasis added). As further explained below, we do not view the vertical conduct alleged here to constitute "price restrictions," or "resale price maintenance." To the contrary, what was alleged here was only a termination of St. Pete because St. Pete presented general intrabrand price competition to Hirsh. There is no allegation that Morgan ever even communicated to St. Pete a desire that any particular resale prices, or prices above or below particular levels, be charged. Also, there is no allegation of such communication between Morgan and Hirsh. It is only alleged in paragraph 13 of the amended complaint that the purpose and effect of the termination, and the disappearance of St. Pete from intrabrand Morgan competition, will be to "fix and stabilize the price of Morgan boats at a price higher than otherwise possible ... ." (emphasis added) Although not determinative as to the ultimate issue of antitrust liability, the foregoing distinction is, we believe, a determinative factor showing that a rule of reason analysis, and not a per se approach, is appropriate. This reasoning is explained in more detail in section B(2)(a) further below.
Termination of a dealer for the sole reason that the dealer does not follow resale pricing practices which the manufacturer prefers is not unlawful. Quinn v. Mobil Oil Co., 375 F.2d 273 (1st Cir.1967), found nothing unlawful in a manufacturer's refusal to deal with a dealer due to the dealer's refusal to reduce prices. The First Circuit Court of Appeals, distinguishing U.S. Supreme Court group boycott cases (see section B(1) below), found no allegation, within the meaning of section 1 of the Sherman Act, of a contract, combination or conspiracy fixing resale prices and noted that "in fact the refusal indicates there has been a failure to obtain an agreement." Id. at 275 n. 7. There is case law which could be interpreted as being inconsistent with Quinn on the basis that permitting "an injured party to bring suit only if he followed the illegal agreement ... would defeat the policy of the antitrust laws." Sahm v. V-1 Oil Corp. 402 F.2d 69, 71 (10th Cir.1968). Nonetheless, as noted above, there is in the complaint before us no allegation that even an offer of an "illegal *1040 agreement" was communicated to St. Pete.
In Sylvania the Supreme Court prescribed a rule of reason analysis for all vertical restrictions, only excepting those described in footnote 18. As stated above, and as also dealt with further below, footnote 18 does not except the type of conduct alleged here. Therefore, the vertical conduct alleged here is to be tested under the rule of reason.

B. The Conduct Alleged in this Case Is Vertical and Nonprice. The Only Potentially Applicable Categories of Per Se Violations  Horizontal Group Boycotts and Vertical Price Restrictions  Are Not Applicable.

Within the foregoing broad definition of per se violations, certain types of conduct are generally considered by the case law to be per se unlawful. These include price fixing, customer allocations, geographical market divisions, group boycotts, tying arrangements, and certain types of reciprocal dealing. See Antitrust Adviser § 1.28 (C. Hills 2d ed. 1978) at 28; American Bar Ass'n, Section of Antitrust Law, Antitrust Law Developments 1-19 (1975); Cernuto, 595 F.2d at 166; D. Ross, S. Milbrath & H. Litchford, The Florida Antitrust Act of 1980  Part 1, 54 Fla.B.J. 605, 607 (1980). Of those types only price fixing and group boycotts appear even potentially to be involved in the allegations of St. Pete. Those two theories have been used in some cases and commentaries, erroneously we believe, as bases to conclude that per se violations exist under facts like those before us. For the following reasons we believe the conduct alleged here to come within neither of those theories.

(1) No Horizontal Group Boycott Was Alleged; The Conduct Was Basically Vertical.

The term "group boycott" is also known as a collective refusal to deal. See Antitrust Law Developments, supra at 17. The term is sometimes used, in the context of the general type of fact situation before us, to refer to conduct of dealers in a particular product, not necessarily or simply to among themselves refuse to sell to another dealer but also to conspire among themselves to induce the manufacturer of that product to refuse to sell to that other dealer. The conduct is thereby characterized as horizontal because of the group conduct on one level of the distribution system.[3]
The concerted, conspiratorial, or group nature of the conduct alleged here, involving alleged collusion between Morgan and Hirsh to terminate plaintiff, might be argued to consist of a group boycott even though the participants in the "group," Morgan and Hirsh, were on different levels of the distribution system. It can be argued that one member of the group is on a distribution level with the terminated dealer and that the effect of the conduct is horizontal since another dealer (St. Pete) is affected. St. Pete so argues, citing 1 von Kalinowski, Antitrust Laws and Trade Regulation, § 2.08[2][a] and [b] (Desk ed. 1982) (which refers to the position represented by Cernuto, discussed below).
However, "conspiracies between a manufacturer and its distributors are only treated as horizontal ... when the source of the conspiracy is a combination of the distributors." Red Diamond Supply, Inc. v. Liquid Carbonic Corp., 637 F.2d 1001, 1004 (5th Cir.1981). An essential element of an unlawful group boycott is that "at least some of the boycotters are competitors of each other and the target." Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d at 1236. In the case before us no group action by other dealers, i.e., *1041 competitors of St. Pete, was alleged, only the action of Hirsh.[4]
We agree with the statement that "while there is some disagreement in the case law, it now appears that to be a per se violation, the group boycott must have a horizontal element  that is, there must be at least two members of the group who are competitors. A pure vertical `boycott'  one in which there are only two conspirators who are on different functional levels, such as one manufacturer and one distributor, will be tested under the rule of reason." Ross, Milbrath & Litchford, supra, at 607.
It is true that the U.S. Supreme Court has considered group action which economically coerces outside parties, whatever its purpose, as being a per se violation of section 1. See Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d at 1234; Antitrust Law Developments, supra, at 17. However, there was alleged here no coercion of St. Pete to do anything and certainly not to do anything regarding the setting of prices. St. Pete was simply terminated. See the discussion of the Quinn and Sahm cases in section A, supra.
In Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the U.S. Supreme Court dealt with whether a per se violation was involved in a group boycott complaint alleging a conspiracy among manufacturers and distributors to cause the manufacturer not to sell to another competing distributor. Although the Supreme Court in Klor's found that to be an unlawful group boycott, it specifically pointed out that "this is not a case of ... a manufacturer and... [i]ts dealer agreeing to an exclusive distributorship." 359 U.S. at 212, 79 S.Ct. at 709, 3 L.Ed.2d at 745. In the case at bar the conduct of Morgan and Hirsh appears essentially to establish Hirsh as Morgan's exclusive dealer in the geographical area involved (or at least as a dealer in the area from which St. Pete is excluded). See also the very often cited and followed case of Joseph E. Seagram & Sons v. Hawaiian Oke Liquors, Ltd., 416 F.2d 71 (9th Cir.1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, holding that it is not a per se violation for a manufacturer to agree with a distributor to give him an exclusive franchise even if this means cutting off another distributor.
In Oreck Corp. v. The Whirlpool Corp., 579 F.2d 126, 131 (2d Cir.1978) (which, with two dissents, was an en banc concurrence with a divided panel opinion, 563 F.2d 54), the Second Circuit, under facts similar to those alleged here, found no group boycott. The Second Circuit distinguished a well-recognized U.S. Supreme Court group boycott case, United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), which involved "price fixing aspects of General Motors' activities in eliciting from (other) dealers ... agreements that none of them would do business with price cutters." 579 F.2d at 132. Citing Klor's, the Oreck majority found that an alleged agreement between a single manufacturer and a single dealer to put another dealer out of business was not subject to the group boycott doctrine involving per se violations.
[S]omething more than an agreement between Whirlpool and Sears to eliminate Oreck must be shown. The agreement becomes violative of section 1 of the Sherman Act only if it is anticompetitive in purpose or effect  in sum, it must be tested by the rule of reason. Without any consideration of the anticompetitive purpose or effect, arbitrarily seeking to protect Oreck simply because Whirlpool refused to renew a contract with Oreck ... even though this refusal was in whole or in part due to persuasion by Sears, disregards the well-established rule that "the antitrust laws ... were *1042 enacted for `the protection of competition, not competitors.'"
Id. at 134, citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701, 712 (1977).[5]
The opposite view, followed in Cernuto, is especially strongly expressed by the Oreck panel dissent and en banc dissent in which there are citations to, and quotations from, numerous cases to the effect that many pricing schemes and group boycotts are per se illegal. 563 F.2d at 60-66; 579 F.2d at 138-141. However, we believe that those other citations and quotations are not applicable to the types of facts at hand or to those in Oreck, Muenster and Cernuto. A principal aspect which makes antitrust law such a difficult and complex field is that it is replete with general statements of law of various kinds, mixed with different economic theories, which can be argued to apply to various different fact situations in contexts dissimilar to those in which the statements were originally made. Also, the U.S. Supreme Court has, to a large extent, been unwilling to spell out in dicta the precise effects which many of its antitrust holdings should have in other contexts. We believe that a conclusion of per se illegality under the facts before us could only represent an unjustified, relatively dogmatic adherence to isolated statements made in other contexts in U.S. Supreme Court price fixing and group boycott cases. See the Oreck panel majority opinion, 563 F.2d at 59 n. 5.
We do not address whether the type of conduct alleged here, involving a single competitor requesting the termination of a dealership, is a common law tort. St. Pete's Counts III and IV, which allege malicious interference with a business relationship, are not before us on appeal and remain pending. But it seems clear from, e.g., Klor's and Hawaiian Oke, supra, that the efforts like those alleged here of one dealer to obtain, in competition with, and to the exclusion of, another dealer, a dealership should not be a per se antitrust violation. An exclusive type of dealership may well promote efficiency in a manufacturer's distribution system, and pursuit of that sort of goal in the manner alleged here should not be considered to have an inherently pernicious effect upon competition for antitrust purposes.[6]

(2) The Alleged Conduct Does Not Constitute A Vertical Price Restriction, I.E., Price Fixing.

(a) No Price Fixing Is Alleged.

As we have said, we do not view the conduct alleged on the part of defendants, i.e., the termination of St. Pete, to be a "per se unlawful price restriction" within the meaning of Sylvania's footnote 18 quoted in Section A, supra. In using that terminology the Supreme Court in Sylvania characterized the kinds of price restrictions to which it was referring as having "been established firmly for many years." See footnote 18 of Sylvania, quoted supra. Therefore, the Supreme Court had to have been referring to "price fixing" albeit conceivably in the broadest sense of that term. (We describe the broad meaning of the term further below.) On the other hand, whether the dealership termination alleged in this case had, and was intended to have, an effect upon prices is a different subject. Whether it does or does not affect prices *1043 and, if so, whether it is unlawful, should be judged under the rule of reason.
Sylvania, a dealership termination case, in its footnote 18 excepts vertical price restrictions, which were not involved in Sylvania, from its rule of reason analysis for vertical arrangements. Whether all vertical price restrictions should be per se violations may be arguable. See Antitrust Adviser 234 (Supp. 1983), and footnote 10 of Justice White's concurring opinion in Sylvania. The brief of the United States as amicus curiae before the U.S. Supreme Court in Spray-Rite appears to take the position that even vertical price restrictions should be tested under the rule of reason, especially in view of the difficulty of determining what price restrictions should be excluded under footnote 18 from Sylvania's rule of reason prescription. Antitrust Adviser 234 (Supp. 1983). But Sylvania says that vertical price restrictions are per se unlawful, and Spray-Rite has not yet been decided by the U.S. Supreme Court.
As stated in Section A above, a price restriction should be susceptible of being a per se unlawful price restriction under section 1 of the Sherman Act when it is just that, i.e., a restriction on prices charged by a reseller in this context. In this case, however, the reseller (St. Pete) was terminated as a dealer. St. Pete was not alleged to have been restricted in the prices it could charge when it was selling Morgan products. Compare Dr. Miles Medical Co. v. John D. Park & Sons, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), the classic resale price fixing case. See also the cases discussed in Section A above to the effect that in the absence of an agreement for the terminated dealer to maintain resale prices, no per se illegality is involved by the termination of a dealer by reason of the dealer's price cutting.
It may well be, as plaintiff alleges, and as Cernuto says, 595 F.2d at 166, that the result will be to put another surviving dealer, even the dealer which asked for the termination (allegedly defendant Hirsh here), in a position to charge higher prices. Nonetheless, that would be a higher price for only the same manufacturer's product which presumably could be constrained by interbrand competition, i.e., by prices of other competitive products. Whether the overall effect would be anticompetitive should be judged under the rule of reason. Sylvania, as quoted in section A above, points out that even vertical, intrabrand restrictions may actually be beneficial.
The effect of the action of the manufacturer here, i.e., the termination of the dealer, is not to fix resale prices; the dealer, following the termination, is hardly in a position to sell at any resale price. And, again, no price agreement between Morgan and Hirsh is alleged. The effect may be to affect intrabrand resale prices by leaving the surviving dealer free from the intrabrand competition of the terminated dealer. But whether or not the essentially nonprice fixing action (the termination) adversely affects interbrand prices, or competition as a whole, can only be determined through a rule of reason analysis. See Carlson Machine Tools, Inc. v. American Tool, Inc., 678 F.2d 1253, 1261 (5th Cir.1982).
Resale price fixing by a manufacturer can arise from either an agreement of a manufacturer and a dealer to maintain certain resale prices or from coercion by the manufacturer against the dealer to require adherence to a suggested resale price. See Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d at 1234. Here no agreement or coercion to that effect was alleged.
The term "price fixing" may be given a literal or a broad meaning. Its literal meaning connotes that in horizontal arrangements "two or more competitors have literally fixed a price," Broadcast Music, Inc. v. CBS, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), and in vertical arrangements that a supplier and a dealer have fixed a resale price. See Dr. Miles, supra. But even giving the term a broad meaning, the conduct alleged in the case before us is not price fixing and therefore *1044 should be tested under Sylvania's rule of reason approach.[7]
A broad meaning to the interchangeable terms "price restrictions" and "price fixing" would include not only literal price fixing but also (a) implied, as well as express, agreements which are directed to price, e.g., which raise, lower, fix, peg or stabilize prices charged, see Antitrust Law Developments, supra, at 2, and cases cited therein; and (b) agreements which are directed to matters which have a necessary and definitive effect upon price, such as, agreements to limit production or to agree on a basic element of price. See cases cited in Ross, Milbrath & Litchford, supra, at 607 n. 6 and 8. The effect of an agreement of a manufacturer and a dealer to terminate a competitive dealer in order to free up the surviving dealer to establish intrabrand prices generally, without the competition of the terminated dealer (which is, at most, what exists here, although the allegations may appear to be only that an "agreement," or conspiracy, exists because Hirsh requested the termination), is significantly different for present purposes from an agreement among those parties to tamper in some particular way with prices and to accomplish the ends, or have the necessary effects, described in (a) and (b) above.
Accordingly, we agree with Oreck's indication, citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129, 1167 (1940), that an agreement involving price tampering may be a per se violation. 579 F.2d at 130-31 (see footnote 5, supra). But, if Oreck was intended to mean what, as we have said above in footnote 5, supra, is indicated in the Oreck en banc majority opinion, 579 F.2d at 131, i.e., that simply a purpose of a manufacturer and a dealer to affect prices (to "enable Sears to raise or to maintain its prices... ." 579 F.2d at 131) (emphasis added) by agreeing to the termination of a competitive dealer constitutes a per se violation, we disagree. It is difficult to believe that Oreck was meant to condemn as per se unlawful an agreement of a manufacturer and a dealer to establish that dealer as the exclusive dealer and terminate another dealer in order to make the dealership exclusive. The purpose and effect is only to affect the ability of, or to "enable," the surviving dealer to establish prices for the manufacturer's products free from the terminated dealer's competition. No per se violation should be involved. That effect must virtually always occur upon establishment of an exclusive dealer who was in competition with the terminated *1045 dealer and wanted its dealership to be exclusive.
St. Pete has alleged that the purpose of the agreement of Morgan and Hirsh was "to fix and stabilize the price of Morgan boats at a price higher than otherwise possible by eliminating plaintiffs as price competitors." We take this to mean only that the purpose was to free up Hirsh to establish Morgan boat prices without the competition of St. Pete. Although the allegations do refer to "a price," the immediately following descriptive phrase ("higher than otherwise possible by eliminating plaintiffs as price competitors") connotes generalities not different from the effects of any establishment of an exclusive dealership with concomitant termination of another dealer. St. Pete has alleged neither an agreement directed to price under (a) above nor an agreement which has a necessary effect upon price under (b) above. See Carlson Machine Tools, 678 F.2d at 1261. St. Pete appears to have alleged no more than a purpose to achieve the result caused by any substitution of one dealer for another, leaving the surviving dealer as the exclusive dealer.
If, upon remand, St. Pete wishes to further amend to allege more than is presently alleged to be the agreement of Morgan and Hirsh, e.g., to allege price restrictions, or price fixing, as we have defined that term above, it should be permitted to do so. We believe we are being consistent with notice pleadings concepts by our foregoing construction of the natural meaning of the above-quoted allegations. We therefore need not address whether antitrust pleadings should ever have greater specificity. See Antitrust Adviser § 11.41 (C. Hills 2d ed. 1978).
Since we are remanding this case so that it may proceed under Count II on the rule of reason standard, we add some observations concerning that standard. Under the rule of reason, an adverse effect upon interbrand prices might be shown to result from action which affects intrabrand prices in this factual context if the manufacturer who terminates a price-cutting dealer possesses substantial market power. Market power might result from the manufacturer being the dominant seller among manufacturers of all competitive products involved. Under those circumstances it may be that an effect upon the manufacturer's intrabrand pricing would have an unlawful effect upon the interbrand prices of other competitive products. See Muenster where the Fifth Circuit Court of Appeals said, citing Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U.Chi.L. Rev. 6, 16 (1981),
"[I]f a firm lacks market power, it cannot affect the price of its product" and thus any vertical restraint could not be anticompetitive at the interbrand level.
651 F.2d at 298. See also Valley Liquors, Inc. v. Renfield Importers, Ltd., 678 F.2d at 745. Professor Liebeler feels that that portion of Muenster is "confusing" because Liebeler does not believe that "purely intrabrand restrictions adopted by firms with ... market power ... [would necessarily] have an anticompetitive effect in the interbrand level." Antitrust Adviser § 2.20 (Supp. 1983) at 204. For present purposes we need not address whether certain intrabrand restraints imposed by a firm with market power would or would not affect interbrand competition.
In any event, in our view for the reasons explained above, St. Pete's complaint does not allege price restrictions. Sylvania broadened the scope of vertical arrangements which are subject to the rule of reason and narrowed the scope of vertical per se unlawful arrangements. Absent further direction from the U.S. Supreme Court in Sylvania, or otherwise, as to the difference between the "nonprice" and "price" vertical "restrictions" to which it referred in Sylvania's footnote 18, we feel the foregoing broad approach justifies our conclusion of no per se liability under the pleadings before us in this case.
We recognize that our conclusion  that the purpose alleged here for the termination (to affect price competition) does not convert the alleged conduct to a per se *1046 violation  is contrary to some federal case law. We agree with appellees' concession that Cernuto, which is contrary to our conclusion, cannot be substantially distinguished on its facts. Also, the Oreck en banc majority opinion (the Oreck panel majority opinion may be interpreted otherwise, 563 F.2d at 59) indicates in this regard a view contrary to ours, see footnote 5, supra, as does Spray-Rite, regarding this point, i.e., whether a purpose to affect intrabrand price competition may create a per se violation through a manufacturer's termination of a dealer at the instance of a competing dealer. Spray-Rite, 684 F.2d at 1284.
However, none of the Cernuto, Oreck or Spray-Rite opinions deals entirely with the type of analysis we have undertaken here in order to achieve what we believe to be consistency with Sylvania. Reduced to greater simplicity, our approach may be summarized as follows. "The first step in our analysis is to determine whether the alleged conspiracy was horizontal or vertical. If horizontal, it would be illegal per se... . [citing Sylvania]; if vertical, it would be tested by the rule of reason... . [citing Sylvania]." Red Diamond, 637 F.2d at 1004. We are dealing in this case with essentially vertical conduct which is not converted to horizontal conduct by the group boycott doctrine. (See section B(1) above.) Therefore, this case should be tested under the rule of reason.
Our approach in this case is not, in the last analysis, different from that in the often-cited case of Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418 (D.C. Cir.1957), where a manufacturer's termination of a dealer, at the instance of another intrabrand competitive dealer who was thereby made the exclusive dealer for that brand within a certain area, was found to be not unlawful.
Since there are other cars "reasonably interchangeable by consumers for the same purposes" as Packard cars and therefore in competition with Packards, an exclusive contract for marketing Packards does not create a monopoly.
.....
There was no contract or conspiracy in restraint of trade within the meaning of the Sherman Act... . When an exclusive dealership "is not part and parcel of a scheme to monopolize and effective competition exists at both the seller and buyer levels, the arrangement has invariably been upheld as a reasonable restraint of trade... ."
Id. at 420.
Nonetheless, again, whether the allegations by St. Pete of anticompetitive effects and of pricing purposes and effects establish Sherman Act violations should be tested under the rule of reason.
We now deal in somewhat more detail with the two cases, Cernuto and Muenster, to which the parties have especially directed our attention, and with Spray-Rite.

(b) Analyses of the Cernuto, Muenster and Spray-Rite Opinions Are Consistent With Our Conclusion That No Per Se Violation Was Alleged.

CERNUTO
We do not agree with Cernuto. The pivotal parts of the Cernuto analysis appear to include:
The question we must consider is whether the conduct at issue here  a manufacturer deliberately withdrawing its product from a distributor that resold it for a price less than its competitors at the request of a competitor  should be classified as a per se violation of the Act... . The pernicious effect is apparent: one competitor has succeeded in excluding another from dealing in United Cabinets through a combination with United and its agent, and, in so doing, has eliminated the possibility of price competition by the foreclosed dealer. Although this harm may have its impact solely in the market for United Kitchen Cabinets, rather than in the general market for kitchen cabinets, it is not for that reason, beyond the *1047 reach of the antitrust laws. The difficult problem here ... is whether the business decision that has been brought into question [the termination of the dealer] has the same redeeming pro-competitive virtues that have been relied upon in rejecting a per se rule in other arguably similar cases. The conduct at issue, it might be said, is merely a decision by a manufacturer to terminate a customer. It is therefore, the argument goes, comparable to the conduct at issue in ... Sylvania ... a case notable for the importance the Supreme Court placed upon the procompetitive aspects of the manufacturer's marketing plan.
595 F.2d at 166-67. Cernuto went on to say:
When a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might be... . [I]f the action of a manufacturer or other supplier is taken by the direction of its customer, the restraint becomes primarily horizontal in nature... . Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.
595 F.2d at 168. Cernuto went on to purport to distinguish Sylvania, which conceedly involved only vertical restraints, by construing the restraints in Cernuto to have horizontal "impact." 595 F.2d at 168.
The common law tort of interference with a business relationship was alleged in Cernuto, was disposed of by summary judgment in favor of defendants, and was not before the appellate court in that case. 595 F.2d at 165 n. 3. As noted above, that tort was alleged in the case at hand in separate counts which remain pending and which are not subjects of this appeal. By saying, as we do, that no per se unlawful antitrust cause of action was stated in this case and, in our view, in Cernuto, we are not saying necessarily that no legal wrong was done. We are only saying we believe that no antitrust per se wrong was done. As is also noted above, in this context the concept that the antitrust laws are for the protection of competition, not primarily for the protection of individual competitors, applies. We believe the Cernuto opinion does not sufficiently take this concept into account. Nor do we believe Cernuto sufficiently takes into account Sylvania's admonition, referred to above, that the primary concern of the antitrust laws is with interbrand, not intrabrand, competition.
The basic and, we believe, incorrect reasoning of Cernuto was to concede "that the alleged combination in the case at hand did not set prices at any exact level. But ... if the purpose and effect of the challenged conduct is to restrain price movement ..., it is then illegal per se." 595 F.2d at 168-69. However, not only did Sylvania not say that, but we agree with the view that the court in Cernuto was, in effect, condemning just the kind of conduct which Sylvania refused to disapprove as per se unlawful, i.e., vertical actions of a manufacturer which have a horizontal effect. See Carlson Machine Tools, Inc. v. American Tool, Inc., 678 F.2d at 1260; Antitrust Adviser 190, 192 (Supp. 1983). Cernuto also appears to equate the "price orientation" of the dealership termination with "price fixing," 595 F.2d at 170, a conclusion with which, as explained in B(2)(a) above, we disagree. Liebeler characterizes Cernuto as "perhaps the most restrictive application of Sylvania by any of the Courts of Appeal." Antitrust Adviser 192 (Supp. 1983).
An unusual facet of Cernuto is that the opinion recognized that the plaintiff in that case could not prove anti-competitive effects and therefore would recover under a per se standard or not at all. 595 F.2d at 165. This facet, at least on the surface, would seem to provide support for a non-per se approach. It could be argued that if the conduct was not anti-competitive under a rule of reason approach, it would be difficult to imagine how it could be so *1048 pernicious as to be per se unlawful. As explained above, Cernuto's purported rationale that the conduct eliminated intrabrand price competition of the terminated dealer seems untenable. We agree with Liebeler's statement that "continued application of Cernuto will lead the courts back into a morass... ." Antitrust Adviser 193 (Supp. 1983). Cernuto would have at least a dampening effect upon competitive efforts to obtain exclusive dealerships, contrary to case law approving agreements for exclusive dealerships even when the result is to terminate another dealer. See, e.g., Klor's and Hawaiian Oke, section B(1), supra. Whether exclusive types of dealerships in particular circumstances have good or bad effects upon competition and ultimate consumer welfare should be tested under the rule of reason which Cernuto to a substantial extent would preclude.
Cernuto cited Packard, supra, as the "best known" of "a scattering of cases suggesting a result contrary to the ... [Cernuto result]." 595 F.2d at 169. Somewhat perplexingly, Cernuto also cites Oreck as among that "scattering of cases." 595 F.2d at 169. Although Oreck was contrary to Cernuto on the group boycott aspect (section B(1), supra), Oreck and Cernuto seem consistent as to the law on a point which is a significant aspect of Cernuto: how to deal with a dealership termination's alleged effects upon intrabrand price competition (see footnote 5, supra). Liebeler also views Oreck as being consistent with Cernuto (and as being wrong) in that respect. Antitrust Adviser 190 (Supp. 1983).
Other cases which deal with the Cernuto type of approach, some of which back off from that approach, are referred to infra in our discussion of Spray-Rite.

MUENSTER
While we agree with the Muenster result (to apply the rule of reason to a dealership termination), Muenster would have provided more direct support for our holding if the Fifth Circuit had been more explicit in saying why Muenster dealt with nonprice restraints, rather than simply adopting the premise, under background facts much like those here, that the restraints it was considering were nonprice. 651 F.2d at 295. The problem in Muenster very clearly seemed to have the same genesis as that alleged here and in Cernuto: price competition by the terminated dealer. The Muenster opinion does not detail the allegations, and we agree with St. Pete that the Muenster opinion does not address price motivations as a purpose of the termination. We might assume that the terminated dealer in Muenster did not allege that purpose however much the facts of the case appear to show that price cutting by the plaintiff-dealer led to its problems with the competing dealer which led to its termination by its supplier. But, even if price protection motivation had been alleged in Muenster, the "restrictions" in Muenster would not have been restrictions on price at all, as explained in section A above.
In Muenster the Fifth Circuit specifically dealt with other types of nonprice restraints (e.g., restrictions on dealership locations) and, consistent with Sylvania, found, for reasons like those we use in the case before us, that those restraints were to be judged under the rule of reason:
[S]ince Continental T.V. ... a supplier's termination of a distributor or dealer is not a violation of the antitrust laws as long as interbrand competition acts as a "significant check on the exploitation of intrabrand market power." [citing Continental T.V. v. GTE Sylvania.]
651 F.2d at 297.
If Muenster had involved allegations like those in the case before us  that the dealership termination had as its purpose the elimination of the intrabrand price competition of the terminated dealer  we believe the Fifth Circuit would have decided the case in the same way. This conclusion is supported by Carlson Machine Tools, Inc. v. American Tool, Inc., supra, at 1259, where the Fifth Circuit characterized as a "vertical nonprice restraint," which was not a per se violation, a manufacturer's termination of a distributor in order to substitute a new exclusive distributor, even *1049 when at the request of the substituted distributor and against the background of the manufacturer having suggested resale prices. The Fifth Circuit called the arrangement a "nonprice" restraint because it did "not seek to impose resale price maintenance on the distributor." Id. at 1259.
In the case before us we construe the broad allegations of the complaint to allege an effect upon not only intrabrand but also interbrand prices. Whether plaintiff can prove that is not before us.

SPRAY-RITE
Spray-Rite, supra, is a case which should be referred to more fully. It was recently argued before the U.S. Supreme Court, and the Court's forthcoming decision in that case could be instructive concerning the types of allegations before us.
Spray-Rite, in which the Seventh Circuit affirmed a judgment of antitrust liability, is dissimilar in one factual aspect to the case at hand and somewhat similar in another aspect. As to one aspect  which principally involves the subject of group boycotts  Spray-Rite appears to be dissimilar. It involved a combination, or group, of competitive dealers requesting the termination of plaintiff-dealer. Accordingly, in contrast to the case before us where only one competitive dealer is alleged to have requested St. Pete's termination, Spray-Rite has group boycott characteristics. As to the other aspect  whether a vertical price restriction was involved  certain of Spray-Rite's statements, with which we do not agree, are in point. As to that aspect, Spray-Rite seems to say that proof of the termination of a dealer following a competitive dealer's complaint to the manufacturer about the terminated dealer's pricing practices is sufficient proof of a per se unlawful vertical price restriction. Although, in contrast to the case at hand, in Spray-Rite those complaints apparently came from other competitive dealers, not simply from one dealer, the opinion says that:
The manufacturer may not terminate a distributor if (1) the termination is at the request of a competing distributor and (2) the termination is motivated by a desire to reduce or eliminate price competition for the manufacturer's products.
684 F.2d at 1234. Spray-Rite also says, "proof of termination following competitor complaints is sufficient to support an inference of concerted action." 684 F.2d at 1238-39. Spray-Rite cites Cernuto.
Our reasons, stated above, for disagreeing with Cernuto are much the same as our reasons for disagreeing with the foregoing statements in Spray-Rite. As explained in section B(2)(a) above, a vertical price restriction, a per se antitrust violation, is, in our view, not established by the mere termination of a dealer following the alleged complaint by a competing dealer about the terminated dealer's pricing practices. (A complaint to a manufacturer by a dealer about another dealer's prices seems not much different in substance for present purposes from a request by the dealer that the manufacturer terminate the other dealer due to its pricing; the complaint is at least an implicit request, and the request is a complaint.)
Also, communications between a manufacturer and a dealer would seem to be inhibited by Spray-Rite in much the same way as they are by Cernuto. To say, as Spray-Rite and Cernuto appear to say, that a dealer may not communicate with a manufacturer about another dealer's prices  or that a manufacturer may not listen to a dealer's comments or complaints about another dealer's prices  seems to ignore realities of the market place and to impose impediments to commerce and competition which would improperly obstruct the ability of a manufacturer to function efficiently. See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 n. 2 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), citing P. Areeda, Antitrust Analysis 560 (2d ed. 1974).[8]
*1050 Whether competitors may horizontally discuss and combine in pricing is one thing. Whether a manufacturer and a dealer, who are working together in a legitimate contractual enterprise, may communicate about prices charged by other dealers, without agreeing upon resale prices to be charged, is entirely another thing. If the manufacturer thereafter terminates another dealer, that may still be the decision of the manufacturer acting to best promote the efficiency of its distribution system. See Valley Liquors, 678 F.2d at 744. But the effect of Spray-Rite as to this supposed "price restriction" aspect seems to be that a price cutting dealer  about whom another dealer could be expected to comment to the manufacturer because that is the inherent nature of its competitive business  may become "locked in" to a dealership: if he is terminated, Spray-Rite would appear to impose at least prima facie liability. The alternative  that the manufacturer not discuss with a dealer prices of other dealers  would seem to produce the result of manufacturers being constrained by unwarranted legal limitations from efficiently conducting their businesses. See Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, supra. Pricing by dealers is of obvious concern to manufacturers. If they cannot get pricing information from one in a natural position to provide it  a dealer  presumably they would have to get it through other means at greater expense and at greater ultimate cost to consumers of their products.
We do not intend to say that all communications between a manufacturer and a dealer are lawful. We are only saying in this context that if they do not constitute price fixing, as defined above, they are at least not so innately pernicious as to bring about per se liability and that they, together with alleged anti-competitive effects, should be tested under the rule of reason.
An undesirable potential outgrowth of the no longer valid Schwinn opinion was that manufacturers might tend to operate their own distribution systems because they were inhibited by Schwinn's per se rules of antitrust illegality from operating efficiently through independent businessmen. The U.S. Supreme Court in Sylvania receded from the short-lived inhibitions upon distribution systems which had been imposed only ten years earlier in Schwinn and which had been so widely criticized. Spray-Rite and Cernuto would appear to have the effect of reverting to those types of inhibitions.
Liebeler points out that if Spray-Rite is followed, "there is little left of Sylvania." Antitrust Advisor 216 (Supp. 1983).

C. The Alleged Conduct Should Be Tested Under Antitrust Law Applicable to Unilateral Refusals to Deal Which Involves a Rule of Reason Analysis.

There are two basic methods to deal with the matter of deciding whether to apply per se standards or rule of reason standards of antitrust legality to a manufacturer's termination of a dealership accomplished *1051 for the purpose of eliminating that dealer's resale price competition: (i) its effect (upon prices) or its motivation (to eliminate a price cutter) should be tested against antitrust standards applicable to commercial conduct generally and not just that involving dealership terminations; and (ii) a dealership termination by a manufacturer, whatever its effect or motive, should be viewed as a separate subject, inherently lawful under the antitrust law and not unlawful except when involving other types of unlawful conduct. The difference in the methods relates basically to the starting point for analysis.
The disadvantage of method (i), which we have used in sections A and B of this opinion and which is used in much case law, is that it tends to ignore, or relegate to relative unimportance, the "Colgate doctrine" which is the basis of method (ii) and which is explained below. That possibly may occur because of some uncertainty or disagreement as to the continued viability of that doctrine. However, we believe no such uncertainty should exist in this context and that it is appropriate to use method (ii) in all unilateral dealership termination cases (those involving either no participation by another dealer or participation only by one other dealer) and, accordingly, to apply rule of reason standards in cases like this. What amounts to method (ii) is generally referred to in many of the opinions cited above but very often is not separately identified as an analytical starting point as we undertake to do here.
Under method (ii), which we now deal with as a more orderly or at least a more soundly based approach, the premise is accepted that the manufacturer is, as a matter of general law, entitled to terminate the dealer (for example, because of expiration of the term of a dealership contract or under specific provisions in a dealership contract or due to the lack of any formal dealership contract at all, as apparently is the case here). Accordingly, it is only the effects of that otherwise lawful action which are to be determined. Commonly under basic antitrust law concepts, effects of otherwise lawful action are determined under the rule of reason.
Method (ii) has as its basis the "Colgate doctrine" that a manufacturer may unilaterally terminate a dealer for any reason, including failure to adhere to the manufacturer's announced resale prices, but that a termination involving "something more" than just the manufacturer's unilateral decision to terminate may be an antitrust violation. See United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and Oreck, 579 F.2d at 133. The distinction between Colgate and Dr. Miles, supra (which finds resale price fixing to be per se unlawful), is that in Colgate "[u]nlike Dr. Miles, there was no charge of an agreement between defendant and its distributors obligating the distributors to sell above specified price levels." American Bar Ass'n, Section of Antitrust Law, Monograph 2, Vertical Restrictions Limiting Intrabrand Competition 72 (1977) (cited in Sylvania's footnote 14 as representing an exhaustive survey of applicable pre-Sylvania law[9]). Likewise, in the case before us there was no such agreement.
The "Colgate doctrine" continues to be a viable part of antitrust law, although its parameters have been severely narrowed in ways not applicable to the case before us. See Carlson Machine Tools, Inc. v. American Tool, Inc., supra, at 1261 n. 5; American Bar Ass'n, Section of Antitrust Law, Monograph 2, supra, at 72-74; Antitrust Adviser 231 (Supp. 1983); 16A von Kalinowsky, supra, § 6C.02; Antitrust Law Developments, supra, at 19-22; Practicing Law Institute, Twenty-first Annual Antitrust Law Institute 269-73 (1980).
The Seventh Circuit in Spray-Rite, 684 F.2d at 1232, summarized conduct which is *1052 lawful under the Colgate doctrine and that which goes beyond the doctrine and is unlawful:
A manufacturer may unilaterally fix a suggested resale price for its product... . It may also lawfully refuse to deal with any distributor that resells the product at a price other than that it has suggested. ... If, however, the manufacturer does anything more than merely announce the suggested resale price and then refuses to deal with distributors that fail to comply with that price, the manufacturer is engaged in a per se unlawful price maintenance scheme. (emphasis added)
If, as Spray-Rite says, a manufacturer's termination of a dealer for failure to adhere to suggested intrabrand resale prices is not unlawful, not to mention not per se unlawful, then there should be no proper basis to condemn as per se unlawful the termination of a dealer for the purpose of affecting intrabrand prices as alleged in the case before us. The purpose would seem to be the same in either situation.
Thus, under method (ii) the question of whether to apply the per se rule or the rule of reason standard in the case before us comes back to whether the alleged conspiracy of Morgan and Hirsh for the termination of St. Pete was enough to be that "something more," i.e., to be within the group boycott rule or to involve price fixing. We say no, as explained in section B above.
See also Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245, 1248 (5th Cir.1975), saying that citations of "numerous cases involving price fixing, group boycotts or attempts to drive a competitor out of business" are not applicable to a case involving a substitution of one distributor for another.
Applying the Colgate doctrine to the basic facts before us, we might give further consideration to also affirming the trial court's dismissal of the rule of reason allegations (Count II). See the Oreck en banc majority opinion which (separate and apart from its citation of Colgate, 579 F.2d at 133) says, "the very same conduct [that involved in Oreck and the type alleged here] can constitute the granting of a perfectly legal exclusive distributorship or one, at least, whose legality must be judged under the rule of reason standard." 579 F.2d at 129-30. However, for the reasons explained above, a rule of reason analysis should not be dismissed out of hand on the pleadings. The amended complaint may be taken to allege injury to competition which is not necessarily restricted to intrabrand competition.
Following the lead of the Fifth Circuit in Muenster, 561 F.2d at 298, we add the following comments of which we are sure the attorneys in this case are cognizant. We assume that the application of a rule of reason analysis will be explored by discovery in this case. A trial of a case like this under the rule of reason would likely fall within the common characterization placed upon an antitrust case as a so-called "big case."
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT HEREWITH.
SCHEB, A.C.J., and SCHOONOVER, J., concur.
NOTES
[1] Sylvania, 433 U.S. at 57, 97 S.Ct. at 2561, 53 L.Ed.2d at 584.
[2] After our opinion in this case was written, the United States Supreme Court's opinion in Spray-Rite was issued. Monsanto Co. v. Spray-Rite Service Corp., ___ U.S. ___, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). We do not believe the Supreme Court's opinion changes our holding and the substance of our opinion in this case. This case continues to be governed basically by Sylvania. See the last paragraph in footnote 6 of the Supreme Court's Spray-Rite opinion. However, reference to that Spray-Rite opinion should be made for the latest Supreme Court statements on certain antitrust aspects which are involved in this case.
[3] At the same time it should be recognized that the U.S. Supreme Court has "failed to articulate with any degree of precision a definition of `group boycott'." Ron Tonkin Gran Turismo v. Fiat Distributors, Inc., 637 F.2d 1376, 1382 (9th Cir.1981) [referring to criticisms of Klor's v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)].
[4] The inclusion of Ronald L. Hirshberg, President of Hirsh Sailing Yachts, Inc., as a defendant does not establish a conspiracy under section 1 of the Sherman Act. A corporation cannot conspire with itself. It acts through its officers whose communications with each other are those of the corporation. See Hackett v. Metropolitan General Hospital, supra; Antitrust Adviser § 1.11 (C. Hills 2d ed. 1978).
[5] Oreck as a whole, however, is severely criticized by Professor Liebeler as showing "no understanding of the basic economic issues involved." Antitrust Adviser 191 (Supp. 1983). As further discussed in section B(2)(a) below, we agree with his criticism of another part of Oreck which, while finding no antitrust liability under the facts of that case, seems to say that if the purpose of an agreement between a manufacturer and a dealer to eliminate a competitive dealer is to enable the surviving dealer to maintain intrabrand prices, a per se violation is involved. 579 F.2d at 131. As Liebeler says, this is the type of conduct Sylvania meant to be judged under the rule of reason. Antitrust Adviser § 2.20 (Supp. 1983) at 190.
[6] For a discussion of reasoning behind the point that unlawful group boycotts require the participation of more than one participant on the same distribution level, see Note, Vertical Agreements to Terminate Competing Distributors, 92 Harv.L.Rev. 1160 (1979).
[7] There would also be at least arguable merit in using the literal approach to decide that the conduct alleged here is not a price restriction. The only problem Professor Liebeler appears to find with the literal approach is that it would be inconsistent with "Sylvania's injunction to determine the scope of the per se rule and the rule of reason on the basis of demonstrable economic effect rather than formalistic line drawing." Antitrust Adviser 233-34 (Supp. 1983). However, Sylvania's definition of per se violations in its footnote 16, quoted supra, itself seems to recognize the necessity for at least some line drawing in separating conduct which should and should not be labeled as per se violations. Footnote 16 notes that certain types of commercial conduct may not always "fit the generalization" as to whether or not they have social utility and points out that the inclusion of certain types of conduct within the per se rule is a "judgment" made "to provide guidance to the business community." The literal approach to per se violations is referred to in Broadcast Music, Inc. v. CBS, 441 U.S. 1, 8-9, 99 S.Ct. 1551, 1556-57, 60 L.Ed.2d 1, 9-10 (1979), in a way which would not seem to exclude its use in interpreting the term "price restrictions" in footnote 18 of Sylvania. Broadcast Music says that even literal price fixing is not necessarily a per se violation. Accordingly, it could be argued that, a fortiori, conduct like that alleged in the case before us, which is certainly less price oriented than literal price fixing, should not be per se unlawful. Also, justification for the literal approach could be found in Justice Powell's dissent in Arizona v. Maricopa County Medical Society, 457 U.S. 332, 357, 102 S.Ct. 2466, 2480, 73 L.Ed.2d 48, 67 (1982). Justice Powell expresses the view that particular arrangements may be per se violations when they have no "procompetitive economies," a term which he uses interchangeably with "competitive efficiencies." 457 U.S. at 362-63, 102 S.Ct. at 2482-83, 73 L.Ed.2d at 70. It seems plain that dealership terminations can bring about those economies and efficiencies. See Muenster where the Fifth Circuit said that defendant manufacturer "merely tried to improve its distribution efficiency by reducing intrabrand competition." 651 F.2d at 298.
[8] In Sweeney the Third Circuit said that its opinion in Cernuto did not hold that when a manufacturer terminates a distributor because of a complaint from another distributor concerning price cutting, those actions constituted a section 1 claim without other proof of concerted action. Sweeney found that under those circumstances there still must be other proof of an unlawful conspiracy in order to support a per se violation. But the Cernuto type of approach continues to be followed in Spray-Rite, supra, and Battle v. Lubrizol Corp., 673 F.2d 984 (8th Cir.1982). The Sweeney approach seems to be followed in Schwimmer v. Sony Corp. of America, 677 F.2d 946 (2d Cir.1982). As Schwimmer says, "[A] manufacturer's mere receipt of complaints from its wholesalers or agents who compete with plaintiff, or its consultation with such other competing wholesalers, standing alone, [does not] support a finding of conspiracy with them." 677 F.2d at 953. Thus, some federal cases have receded from the Cernuto approach. There has developed a split as to whether evidence of a conspiracy other than evidence of a dealership termination following a request from another dealer for that termination is required for per se liability. Sweeney and Schwimmer say yes. Spray-Rite and Battle say no. See Justice White's dissent to the denial of certiorari in Schwimmer, 459 U.S. 1007, 1008 n. 1, 103 S.Ct. 362, 363 n. 1, 74 L.Ed.2d 398, 399 n. 1 (1982). But even Sweeney and Schwimmer, in contrast to the case before us, involved apparently stronger cases for antitrust liability because in those cases other competing dealers, i.e., more than one other competing dealer, allegedly conspired to cause a dealership termination.
[9] As noted above in the opening "Summary" portion of this opinion in our supplemented quotation of the Antitrust Adviser's statement of the Sylvania holding, Sylvania reverts to pre-Schwinn case law which we believe, in pertinent part, is accurately represented by the foregoing quotation from the monograph as describing lawful conduct.